**Dale H. AWTRY, et al.**

·v.

**The UNITED STATES.**

**No. 603–80C.**

United States Court of Claims.

July 28, 1982.

Thomas C. Henry, Washington, D. C., attorney of record, for plaintiffs. Carl L. Shipley and Shipley, Smoak & Henry, Washington, D. C., of counsel.

Thomas W. B. Porter, Washington, D. C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D. C., for defendant. Thomas D. Edmondson, Dept. of Agriculture, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and NICHOLS, Judges.

ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This case is before the court on cross-motions for summary judgment. Plaintiffs are former officials of the Department of Agriculture, transferred or removed on a change of administration for reasons more

or less political, and now holding different and less desirable government positions, or none. They claim the benefit of the first amendment rule which, as adumbrated in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), they say raises a bar against the personnel actions meted out to them. We hold that the petition of all of them must be dismissed as wanting equity, though for varied reasons. Our reasons are unrelated to the merits of the cases, which we do not reach. We state the facts so far as relevant in part I hereafter. We give the reasons for dismissal in parts II and III, separately as to each of two groups, in one or the other of which all the plaintiffs fall.

# I

Plaintiffs were formerly employed as State Executive Directors of the Agricultural Stabilization and Conservation Service (ASCS) or State Directors of the Farmers Home Administration (FmHA), both agencies of the U. S. Department of Agriculture. Originally there were 32 plaintiffs, but 10 voluntarily dismissed May 29, 1981, and another June 14, 1982.

All plaintiffs were discharged or transferred in April 1977, after inauguration of President Carter and induction of his appointee, Bob Bergland, Secretary of Agriculture. The positions are classified GS–13, GS–14, and GS–15 in the Civil Service and are listed on its Schedule A. This schedule denotes excepted positions not of a policymaking or confidential character, but they have been held to be policymaking nevertheless, as will appear. An excepted position is one which does not enjoy the legal attributes of the "competitive service." Defendant, with its motion, spells out the statutory authority whose applicability is unchallenged and need not be repeated, by which the positions were created and under which they were classed in Schedule A. It is uncontested that incumbents of such excepted positions do not enjoy the statutory protections allowing removal only for cause. Some of them enjoy qualified protection as veterans, but there is no issue of a breach

of veterans' preference in their cases. None of them can claim the kind of property rights in their jobs attributed to tenured employees in *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–2709, 33 L.Ed.2d 548 (1972). It has over the years been assumed the positions were "patronage" ones subject to removal without cause on a change of administration, or indeed at any other time, but the question whether the first amendment barred such removals in 1977 would require trial but for the threshold issues defendant successfully invokes in this proceeding.

The Agriculture Department is decentralized and performs many functions at a state level. The ASCS thus administers programs for the acreage allotment, price support, and farm marketing quota programs. It works through county committees elected by farmers. State committees establish policies within the states. The state executive directors include some of the plaintiffs here. They are responsible for planning, coordinating, and managing these programs. They assist the state committees in establishing policies. The FmHA is responsible for loan and grant and other assistance programs for the benefit of rural areas. There are 42 state offices, some serving more than one state, and 1,750 county offices. Each state director supervises such a state office, and our other plaintiffs were such state directors. Each one supervises a staff of approximately 100 persons. He acts widely as a public speaker and educator regarding administration programs, thereby serving as its pipeline and advocate at the state and local level.

We are impressed, as are other tribunals that have considered the issues, with the enormous powers exercised by the incumbents of these positions. Here is no matter of process services or assistant public defenders.

Shortly after Mr. Bergland took office in 1977, a group sued him in the United States District Court for the District of Columbia, calling themselves Committee for Protection of First Amendment Rights. The parties differ which of our present plaintiffs

were parties to that suit. For reasons that will appear, we need not resolve the question. We assume some were. They sought injunctive and declaratory relief without money damages. The Civil Service Commission (CSC) was also named. Counsel was Mr. Shipley, whose name also appears in our case, though Mr. Henry is counsel of record. District Judge John Pratt conducted a hearing on the motion for preliminary injunction consolidated with the merits. His conclusion was to dismiss the suit. He made detailed findings of fact. Judge Pratt doubted if *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) applied because the employees in *Elrod* were not federal and occupied minor positions, while the instant plaintiffs were policymaking and came within the exception from first amendment protection against patronage removal, recognized in *Elrod*. In any event, the plaintiffs before Judge Pratt could not have saved their jobs by changing political affiliation, as those in *Elrod* were invited to do, nor did Mr. Bergland pressure them to change parties. *Committee for Protection of First Amendment Rights of Department of Agriculture Employees v. Bergland*, 434 F.Supp. 314 (D.D.C.1977).

The D. C. Circuit, remanded by unpublished order, 578 F.2d 441 (1978), to have the district judge consider more evidence, but after considering it, he reaffirmed his previous position on new cross-motions for summary judgment and the D. C. Circuit affirmed, 626 F.2d 875 (1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3012, 65 L.Ed.2d 1113 (1980). The nature of the appellate holding is crucial to our conclusions as to certain plaintiffs and we consider it more at length in part III. Briefly, it turns still on *Elrod v. Burns* and its policymaking exclusion. *Branti v. Finkel, supra*, was still in the future.

Another former FmHA state director, Mahlon H. DeLong, was removed and sued in the U. S. District Court in Alexandria, Virginia. He lost initially, but obtained a remand after *Branti v. Finkel* for reconsideration in light of that case. *DeLong v. United States*, 621 F.2d 618 (4th Cir. 1980). Though published in five volumes of F.2d

before the D. C. Circuit decision, it considers *Branti v. Finkel* which the D. C. decision does not. After the remand, the district judge ordered Mr. DeLong reinstated, but an appeal from that order has been settled and dismissed. It is a Tucker Act (28 U.S.C. § 1491) suit for back pay and reinstatement. As stated, some of our present plaintiffs were not parties to any prior litigation.

## II

■ Defendant grounds its cross-motion in part upon laches. We have no hesitation in concluding that plaintiffs who were parties to *Committee v. Bergland* are not barred by laches, but that the others are so barred:

> * * * One cannot sit back, wait years for someone else to act as his stalking horse, and then ride the coattails of a favorable judicial decision irrespective of the delay involved. * * * [*Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1253, 1259 (3d Cir. 1974).]

Still less is this so if the prior decision has been unfavorable, as here. *Cf. American Law Institute*, RESTATEMENT (SECOND) OF JUDGMENTS § 62. Defendant was entitled to go into the prior litigation and display all the defenses it had, in the reasonable belief that what was at stake was its liability to all potential as well as actual committee members. It is inequitable to allow others to draw defendant out of its trenches and then, having observed the prior plaintiffs' mistake, to attack defendant by a different corridor. It is still more inequitable when the same counsel represents both groups. The time lapse between the discharges and the filing of this suit was roughly 3 years and 6 months. It is not suggested, nor could it be, that any of this time was spent exhausting administrative remedies, of which there were none. Defendant is also prejudiced because the pay of the positions went to others during the period involved and it would now have to pay twice for the services of only one incumbent. In *Brundage v. United States*, 205 Ct.Cl. 502, 504

F.2d 1382 (1974), *cert. denied*, 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975), we held that a delay period of 3 years, 8 months was quite enough for laches, referred to prior cases when less was enough, down to 11 months only in *Norris v. United States*, 257 U.S. 77, 80, 42 S.Ct. 9, 10, 66 L.Ed. 136 (1921), when double pay for the same job is involved. *See also Frommhagen v. United States*, 216 Ct.Cl. 1, 573 F.2d 52 (1978), *cert. denied*, 440 U.S. 909, 59 L.Ed.2d 457 (1979).

### III

■ We also hold that the persons who were parties to *Committee v. Bergland* are collaterally estopped by the findings of fact and conclusions of law in that case, in which they had and exercised a full and fair opportunity to litigate. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). In *Monterey Life Systems v. United States*, 225 Ct.Cl. ——, 635 F.2d 821 (1980), we reviewed the most recent Supreme Court pronouncements on collateral estoppel, but declined to apply it against the government because the fact issues in the supposed estopping cases were different from the case then at bar.

Plaintiffs assert that the fact issues in the instant case are likewise different from those in *Committee v. Bergland*. In a nutshell, the issue in *Committee v. Bergland*, plaintiffs say, was whether plaintiffs were policymaking officials. According to the then latest pronouncement of the Supreme Court, say plaintiffs, the new first amendment bar against removal of officials on political patronage grounds did not apply to policymakers. *Elrod v. Burns, supra.* They would not in this court relitigate that issue. But by *Branti v. Finkel, supra*, which came down too late to guide the D. C. Circuit, the policymaker issue is abandoned and cast aside in favor of an issue whether political affiliation was a bona fide occupational qualification (BFOQ) of the job in question. This is the issue they would litigate, and the construction of *Branti v. Finkel* they would apply. It is true that a comparison of dates shows that the D. C. Circuit could not have been aware that *Branti v. Finkel* was com-

ing down when it promulgated its decision December 27, 1979, although publication seems to have been withheld until after denial of certiorari, which occurred June 16, 1980. The petition for certiorari was thus before the Supreme Court when it decided *Branti v. Finkel*, but according to the usual rule of interpreting the Supreme Court, we attach no significance to the denial of certiorari, though the temptation to do otherwise is exceptionally great, in view of the times involved.

Plaintiffs' theory is that by *Branti v. Finkel*, the constitutional right of a public employee not to be discharged for patronage reasons is enlarged over its previous scope. When previously it did not extend to policymaking employees, now it does, unless political party membership is a BFOQ of their jobs.

The lay public supposes that the Constitution is what the Justices say it is, and it cannot imagine any source of constitutional requirements except the fiat of the Justices in the cases immediately before them. Anyone who disputes the Justices' interpretation of the Constitution is held to be against the Constitution itself. There is too much of this unscholarly and unhistorical view of the Supreme Court's role in plaintiffs' argument here. Out of the blue the Justices have amended and enlarged the first amendment, not once, but twice. To set matters in their proper perspective, it is useful to ascertain the origin of the doctrine involved in both *Elrod v. Burns* and *Branti v. Finkel*, and this does not involve quite as prolonged and laborious a pilgrimage as locating the sources of the Nile once did.

The Supreme Court's *Elrod v. Burns* affirms the Seventh Circuit's *Burns v. Elrod*, 509 F.2d 1133 (1975). This in turn relies wholly on *Illinois State Employees Union v. Lewis*, 473 F.2d 561 (7th Cir.), *cert. denied*, 410 U.S. 943, 93 S.Ct. 1370, 35 L.Ed.2d 609 (1972), which is cited five times in a brief opinion. One therefore turns to that case and has arrived at the source, other than the first amendment itself, of the involved doctrine at least so far as concerns the

judicial branch. The district court decision had been adverse to the doctrine, as were decisions of other U. S. District Courts in that circuit, and as were all the decisions already reported outside the circuit, *Alomar v. Dwyer,* 447 F.2d 482 (2d Cir. 1971), *cert. denied,* 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972) and *American Federation v. Shapp,* 443 Pa. 527, 280 A.2d 375 (1971). The judicial author of *Illinois State Employees Union v. Lewis* was then Circuit Judge, now Justice, Stevens, but one member of the panel, Judge Campbell, concurred separately and Judge Kiley dissented. The justification for not following the previous weight of authority, partly with Judge Stevens, wholly with Judge Campbell, was *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) which Judge Campbell said "dictated" his new and novel holding. *Perry v. Sindermann* remands for trial on the facts the contention of a nontenured state college teacher that the nonrenewal of his contract of employment was a reprisal for his publicly stated opposition to policies of the Board of Regents. The theory of the *Illinois State Employees Union v. Lewis* is that Lewis was actually coercing state employees to change their political affiliation by threat of terminating their jobs. The parallel is obvious. This is how in life, "novel and surprising" constitutional doctrines get to be born.

Then Circuit Judge Stevens says in *Lewis* at 574:

* * * Plaintiffs properly do not challenge the public executive's right to use political philosophy or affiliation as one criterion in the selection of policy-making officials. Moreover, considerations of personal loyalty, or other factors besides determination of policy, may justify the employment of political associates in certain positions. It is difficult to believe, however, that any such justification would be valid for positions such as janitors, elevator operators or school teachers. * * *

Judge Campbell summarizes the proposition at 578:

* * * As Judge Stevens so aptly states, there may be instances when political af-filiation constitutes a proper qualification for public employment, particularly in the selection and appointment of "policymaking" officials. * * *

He goes on to defend the right of elected officials to appoint persons in whom they have confidence. He refers to the difficulty of distinguishing between policymaking and non-policymaking positions and notes that a more precise definition will have to "await case by case determination." He does not read as at all happy with the doctrine he deems "dictated." Still, we may allow those who originate a new doctrine of constitutional law to define its terms and limits. Thus we see at the very birth of the new doctrine the intimate mingling of the two ideas—policymaking and political association.

When *Elrod v. Burns* reached the Supreme Court, Justice Stevens was on it, but he silenced himself by recusal. Justice Brennan, who wrote the "plurality" opinion 427 U.S. at 367, 96 S.Ct. at 2686, acknowledges that "[n]o clear line can be drawn between policymaking and nonpolicymaking positions." He seems to refer to the passages already quoted when he says, at 368, 96 S.Ct. at 2687:

* * * In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals. Thus, the political loyalty "justification is a matter of proof, or at least argument, directed at particular kinds of jobs." *Illinois State Employees Union v. Lewis,* 473 F.2d at 574. * * *

This is the third reference to that case in the plurality opinion, and it is a fair inference that the plurality fully intended to recognize, as the Seventh Circuit previously had, that policymaking could not feasibly be used as the sole criterion for identifying a class of public servant that common sense demands be selected and retained with some regard for partisan considerations. It must be recognized that the grievants in both cases were low level state or county employees who by no stretch of the imagi-

nation were policymakers. The references to the latter category were pure dicta, but necessary dicta. Having properly stated the rule of law they relied on, the judges and Justices conscientiously undertook to state its limits, for no rule of law—especially a novel one—can be understood unless its limits are known. But they were far removed from having to solve the problems of definition they all, and Judge Campbell particularly, foresaw.

Now we come to *Branti v. Finkel, supra.* The grievant was an assistant public defender, a case requiring much closer attention to definition of the excepted "policymaking" category than the previous ones considered. Justice Stevens is back in the picture, writing for a majority of the Court to apply the doctrine he had originated. He says a position may be appropriately considered political but not policymaking, *e.g.,* an election judge to represent his party supervising an election. Or it can be policymaking but not political, *e.g.,* a football coach at a state university—

> * * * In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved. [445 U.S. at 518, 100 S.Ct. at 1294.]

He also holds that actual pressure on an employee to change his party affiliation is not required to establish a first amendment violation. It suffices if the discharge is solely motivated by nonaffiliation with or nonsponsorship by the ruling party. This disposes of one alternative ground of Judge Pratt's analysis in *Committee v. Bergland* which, however, the court of appeals does not rely on.

We do not read the first point as rejection of the policymaking versus nonpolicymaking analysis. Rather, it is a matter of permitting use of other criteria to arrive at the conclusion when that one alone is not helpful or is too difficult to apply. The ultimate point is that whatever policymak-

ing the assistant public defender does relates to the needs of his clients, just as the football coach's does to the needs of his team, and has no bearing on "partisan political concerns." There is no suggestion that the policymaking analysis may not be resorted to even when it is helpful.

■ Turning now to the court of appeals decision in *Committee v. Bergland,* we note it is one of the last, if not the last, by that master jurist now unhappily gone from us, Judge Leventhal. He uses the "policymaking" language of cases before *Branti v. Finkel,* but it is clear from the context and the words used that political considerations enter into job performance to a degree unknown to an assistant public defender. After reciting the enormous powers exercised, he concluded—

> Each state director supervises a staff of nearly 100 statewide and acts as "the administration's pipeline and advocate at the state and the local level." (Footnote omitted.) (Quoting one of Judge Pratt's findings of fact.) [626 F.2d at 879.]

One who acts as "the administration's pipeline at the state and local level" is certainly in politics up to his neck, particularly when the subject matter is the enormous aid extended to American agriculture. Everyone knows and we can take judicial notice how each party competes every 4 years to persuade the farmer that it will do more for them than the other party will. No other pressure group is cultivated so overtly. Judge Pratt also found, not quoted by Judge Leventhal:

> Each director acted as a public speaker and educator regarding the administration's program.

The close and interesting part of Judge Leventhal's opinion is not this, but the concluding part in which he deals with the fact that the CSC had refused to classify the involved positions under Schedule C, the schedule for policymaking and confidential jobs, but under Schedule A, supposedly less political. He explains this partly by the uses of English which we all know to have been peculiar to the old CSC and partly by surmising that Schedule A is for jobs that

the Commission considers less political and hopes to "nudge" into the "career service." But, he says, *Elrod*-type constitutional status cannot be imputed merely on the basis of the "hopeful expectations" of the CSC. Thus he considers that under the findings, the jobs are political despite the contrary hopes of the CSC. It is obvious, therefore, that in *Committee v. Bergland* as in all related litigation before *Branti v. Finkel*, the term "policymaking" is somewhat, among other things, of a term of art or euphemism for "political." The thrust of Justice Stevens' effort is not to change the law that would apply to any particular set of facts, but to clarify what was previously obscure and to call things by their right names.

*Shaw v. United States*, 226 Ct.Cl. ——, 640 F.2d 1254 (1981), was the first case we knew of in which the new first amendment right was invoked in a Tucker Act suit for money damages. We were aware of *Branti v. Finkel* but quoted at length the "policymaking" language of *Elrod*, thus showing we did not then consider anything in *Elrod* to have been overruled or modified by *Branti v. Finkel*. That is still our opinion. Mr. Shaw's case was clearly outside the first amendment because his political allegiance played no part in his removal. He had been hired by the opposite party from his own and removed by his own party after they came into power.

Our conclusion therefore, is that the district judge and the panel of the court of appeals in *Committee v. Bergland*, considered whether the nature of the positions was such as to make political affiliation a BFOQ, to the full extent *Branti v. Finkel* would have made such considerations appropriate, that plaintiffs had a full and fair opportunity to litigate that issue, and that, therefore, plaintiffs, such of them as were parties to *Committee v. Bergland*, are collaterally estopped.

### IV

Since there can be no plaintiffs in this case who were not either parties to *Committee v. Bergland*, or could have been but

were not, there are none who are not either collaterally estopped, or else barred by laches. Accordingly, plaintiffs' motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.