**SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 460–86L.**

United States Claims Court.

May 31, 1991.

Riney B. Salmon, II, Phoenix, Ariz., for plaintiff. Mikel L. Moore, Phoenix, Ariz., of counsel.

Glen R. Goodsell, Washington, D.C., for defendant. Robert Moeller, U.S. Dept. of Interior, Phoenix, Ariz., of counsel.

## OPINION

MARGOLIS, Judge.

This case comes before the court on the defendant's renewed motion for summary judgment and the plaintiff's cross-motion for summary judgment on liability. After a careful review of the record, and after hearing oral argument, this court denies the defendant's renewed motion for summary judgment and grants the plaintiff's cross-motion for summary judgment on liability.

## FACTS

Detailed accounts of the facts appear in earlier opinions of this court, *San Carlos Irrigation & Drainage District v. United States*, 15 Cl.Ct. 197, 198–201 (1988), and of the United States Court of Appeals for the Federal Circuit, *San Carlos Irrigation & Drainage District v. United States*, 877 F.2d 957, 958–59 (Fed.Cir.1989). A brief summary of facts relevant to the issues raised by the parties' cross-motions follows.

Congress enacted the San Carlos Act, ch. 288, 43 Stat. 475 (1924) ("Act"), creating the San Carlos Irrigation Project ("Project") and authorizing the construction of the Coolidge Dam ("Dam") across the Gila River. The Act provided that irrigable water collected behind the Dam would be distributed to Project lands, half of which are on the Gila River Indian Reservation and half of which are public and private lands. The Act directed the United States to enter into a contract ("Repayment Contract") with an irrigation district representing private non-Indian owners of Project lands. 43 Stat. at 476.

Congress authorized the development of hydroelectric power generation facilities at Coolidge Dam and allowed the Secretary of the Interior ("Secretary") to sell surplus power generated there. Act of March 7, 1928, ch. 137, 45 Stat. 200, 210–11. On July 16, 1928, private non-Indian landowners organized the San Carlos Irrigation and Drainage District ("District"), the plaintiff in this case, to represent them in dealings with the defendant, the United States.

On June 8, 1931, the District and the United States entered into the Repayment Contract. It defined the Project Works as including, *inter alia*, the Coolidge Dam, the San Carlos Reservoir, and everything pertaining thereto, including the power plant and electrical transmission lines. The United States agreed to continue to maintain the Project Works and the District agreed to pay annually to the United States, in addition to all operating and maintenance costs, five percent of the construction cost of the project plus interest. Subsequently, the Secretary executed a Joint Works Order defining the Joint Works to include the Coolidge Dam, San Carlos Reservoir and electrical power generating, transmission and distribution system, and continuing the government's responsibility of operating and maintaining those structures. The United States promised that it would continue to operate and maintain the Joint Works "in the best possible manner so as to promote efficiency and economy in the use of water and conserve the Project water supply." The United States, through the Bureau of Indian Affairs ("BIA"), retained exclusive control and management of the Project and Joint Works' operation and maintenance.

On October 1, 1983, a storm caused large inflows of water into the San Carlos Reservoir. On October 4, the reservoir began to spill over the spillway crest and down the

spillways.[1]  Considering the size of the spillways, the spill was a minor one.[2]  Yet the gates in the spillway were inoperable and there was no way to control or stop the spill.[3]  On October 6, the cylinder gates that allow water to enter the penstocks [4] were closed.  Also on October 6, the switchyard began to settle, causing the soil to cave in and resulting in damage to electrical equipment in the switchyard.  The Dam was shut down and evacuated, leaving no way to generate electrical power or store water.

On July 28, 1986, the District filed suit for breach of its contracts and agreements with the United States.  On July 28, 1988, this court granted the defendant's motion for summary judgment on the ground that the plaintiff did not state a claim for which relief may be granted.  *San Carlos*, 15 Cl.Ct. at 204.  The United States Court of Appeals for the Federal Circuit reversed, interpreting the Repayment Contract to require the government "to keep the entire Joint Works, including the spillways and electrical generation system, in a state of repair and to safeguard against their failure."  *San Carlos*, 877 F.2d at 960.  The court further stated that "[i]f the District can prove that the government has breached its duty to maintain the Joint Works, including the spillways and the electrical generation system, general damages may be recovered."  *Id.* (citations omitted).  It also declared that "[t]he District may be able to recover consequential damages if it can prove that they were foreseeable at the time of contract formation."  *Id.* (citing *Prudential Insurance Co. v. United States*, 801 F.2d 1295, 1300 (Fed.Cir.1986)).

The issue now before this court on cross-motions for summary judgment is whether the United States breached its contractual duty to operate and maintain the Joint Works.  The United States asserts that it is entitled to summary judgment because the District's action is barred by the statute of limitations, precluded by the equitable doctrines of laches and estoppel, and precluded by the Repayment Contract's funds available clause.  Because there are no genuine issues of material fact in dispute, the United States claims it is entitled to summary judgment as a matter of law.  The District disavows the statute of limitations, laches and estoppel and funds available clause arguments, and asserts that there are no genuine issues of material fact, and that the District is entitled to summary judgment as a matter of law.

## DISCUSSION

### Statute of Limitations

■  The Claims Court's statute of limitations provides that every claim is time-barred "unless the petition thereon is filed within six years after such claim accrues."  28 U.S.C. § 2501 (1988).  This is a jurisdictional requirement and hence is strictly construed.  *Collins v. United States*, 14 Cl.Ct. 746, 751, *aff'd*, 865 F.2d 269 (Fed.Cir. 1988), *cert. denied*, 492 U.S. 909, 109 S.Ct. 3222, 106 L.Ed.2d 572 (1989).  "A claim first accrues when all the events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action."  *E.g., Japanese War Notes Claimants Association v. United States*, 178 Ct.Cl. 630, 632, 373 F.2d 356, 358, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967).

The United States contends that the District's claims based upon the improper

---

**1.**  A spillway is a channel for reservoir overflow.

**2.**  The spillways were designed for a maximum discharge of 120,000 cfs (60,000 cfs per spillway).  The District contends that the maximum discharge of the spill was 4,000 cfs (2,000 cfs per spillway).  The government estimates that the maximum discharge of the spill was 5,000 cfs (2,500 cfs per spillway).  In any event, the spill was small in comparison to the capacity of the spillways.

**3.**  The maximum height of the spillway flow reached 2.5 feet over the spillway crest.  If the gates had been operable, and properly operated, twelve feet would have been added to the spillway crests, preserving the designed storage capacity of the Dam.

**4.**  A penstock is a large diameter pipe that carries water from the reservoir through the dam to the power plant where the water, which is under high pressure, is used to generate electricity.

maintenance of the spillway gates are time-barred. As in its first motion for summary judgment, the United States argues that the District's claim of improper maintenance of the spillway gates accrued no later than 1966, and arguably as early as the 1940s when the District first became aware that the spillway gates were inoperable. Alternatively, the government maintains that, at the latest, the spillway gate claim accrued when the Reservoir first overflowed in February 1980, more than six years before plaintiff's complaint was filed. The government theory is that the cause of action first accrued when the District did not receive its share of water or power in 1980. In essence, the argument of the United States is that the District could have brought suit at the time of the first breach of the contractual duty to operate and maintain the Joint Works, and since it failed to do so, its spillway claims are time-barred.

The government's argument misapprehends the nature of the contractual duty imposed by the Repayment Contract. Underlying the argument is the contention that the duty of the United States is a one-time duty to maintain. The United States Court of Appeals for the Federal Circuit, however, has made clear that the contractual duty under the Repayment Contract is a *continuing* duty to operate and maintain the Joint Works. *San Carlos*, 877 F.2d at 960. As the court stated:

We construe the general duty as including within it the specific duties to operate and maintain the spillways and electrical generation system. The government agreed to *continue* to maintain all of the Project Works.... The plain language of the Repayment Contract convinces us that the government contracted to keep the entire Joint Works, including the spillways and electrical generation system, in a state of repair and to safeguard against their failure.

*Id.* (emphasis added, citations omitted). The District argues that the United States was under, and remains under, a continuing duty to maintain. As such, the spills of 1980 and 1983 were each separate partial breaches of the Repayment Contract. A

cause of action arose for each partial breach, and the statute of limitations applies separately to each partial breach. This court agrees with the argument of the District.

On the subject of continuing contracts, Professor Corbin stated:

There are contracts, however, that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made. These contracts too are capable of a series of "partial" breaches, as well as of a single total breach by repudiation or by such a material failure of performance when due as to go "to the essence" and to frustrate substantially the purpose for which the contract was agreed to by the injured party. For each "partial" breach a separate action is maintainable, just as in the case of an "instalment" contract; and for a series of "partial" breaches occurring before any action is brought only one action is maintainable.

4 A. Corbin, *Corbin on Contracts* § 956, at 841 (1951), *cited with approval in Paul Holt Drilling, Inc. v. Liberty Mutual Insurance Co.*, 664 F.2d 252, 255–56 (10th Cir.1981); *Kaiser v. Northwest Shopping Center, Inc.*, 587 S.W.2d 454, 457 (Tex.Civ. App.1979).

The events in 1980, in 1966 and in the 1940s, are alleged breaches of the Repayment Contract for which the United States claims the District should have brought suit. However, the breaches were partial, not total ones. A partial breach is "[a] claim for damages ... based on only part of the injured party's remaining rights to performance." Restatement (Second) of Contracts § 236(2) (1979). A total breach may be "by repudiation or by such a material failure of performance when due as to go 'to the essence' and frustrate substantially the purpose for which the contract was agreed to by the injured party." Corbin, *supra*, § 956, at 841. "A claim for damages for total breach is one for damages based on all of the injured party's remaining rights to performance." Re-

statement (Second) of Contracts § 236(1). The record shows that the United States did not repudiate the contract, but instead continued attempts to perform thereunder.[5] Since potential claims based on the pre–1983 events would not have been based on all of the District's remaining rights to performance by the United States, they would not constitute claims for total breach.[6]

Every breach gives rise to a claim for damages, *id.* at comment a; thus, a new claim accrues each time a partial breach occurs. Even if one accepts the argument that the events in the 1940s, in 1966, and in 1980 constituted breaches of the Repayment Contract, each partial breach is a separate claim. As such, the statute of limitations applies to each partial breach. As Professor Corbin stated:

> The period fixed by a statute of limitations begins to run from the "accrual of the cause of action." Since "cause of action" is so uncertain and variable a concept, serious injustice may be done unless the court uses judicial discretion in applying such a statute in the case of "partial" breaches of a single contract. No doubt there is much authority for the statement that where separate actions would lie for a series of breaches, the statute operates against each one separately as of the time when each one could have been brought, and that this rule is not affected by the fact that after two or more such breaches have occurred the plaintiff must join them all in one action. Of course, if an action for a first instalment is barred by the statute, it can not be properly included in an action for later instalments that are not yet barred.

Corbin, *supra*, § 951, at 823–24 (footnote omitted). The statute of limitations applies separately to the alleged breach of 1983. The fact that other partial breach claims, not raised in this litigation, are now time-barred is of no consequence. Because the

final alleged breach occurred in October 1983, within the six-year statute of limitations, the District's cause of action is not time barred.

The government argues, however, that the BIA's alleged failure to maintain the spillway gates was not a continuing violation for purposes of determining when the District's cause of action accrued. The government cites several cases to support the proposition that, in limited circumstances not present in this case, a continuing course of action by the United States constitutes a continuing breach of a duty, resulting in the accrual of separate claims under Section 2501. *See, e.g., Starobin v. United States*, 229 Ct.Cl. 67, 72, 662 F.2d 747, 750 (1981); *Friedman v. United States*, 159 Ct.Cl. 1, 7, 310 F.2d 381, 384–85 (1962), *cert. denied sub nom., Lipp v. United States*, 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963); *Avery v. United States*, 165 Ct.Cl. 357, 330 F.2d 640 (1964). The United States argues that because the continuing claim doctrine is narrowly applied, as stated in *Hart v. United States*, 17 Cl.Ct. 481, 484 (1989), *rev'd*, 910 F.2d 815 (Fed.Cir.1990), it should not be extended beyond the presently approved contexts or applied to the situation presented in this case.

The District is not claiming a continuing breach of the Repayment Contract, but rather that there were partial breaches of a continuing contract. Therefore, continuing claims cases are not on point. Both parties fail to cite cases which enunciate a rule similar to that advanced by Professor Corbin and demonstrate that the District's claim based on the 1983 partial breach of the Repayment Contract is not barred.

In *Aktiebolaget Bofors v. United States*, 139 Ct.Cl. 642, 643–44, 153 F.Supp. 397, 398 (1957), an arms manufacturer sued the United States for breach of contract on the ground that the government repeatedly vio-

---

**5.** Throughout the 1960s, the BIA proposed various ways to install operable gates in the spillways to replace the inoperable ones. Temporary "flashboards" were installed during the 1970s, but were removed because they were found to be unsafe.

**6.** Arguably the alleged breach occurring in October 1983, resulting in failure of the Project Works, was a total breach, since total failure would seem to "go to the essence" of the contract. However, this alleged breach occurred within the six-year statute of limitations period.

lated an agreement not to export a weapon that the government was licensed, as per the contract, to make and use in the United States. The contract was made in 1941, and alleged violations of the non-export agreement occurred in 1942 and continued up until close to the time that the suit was filed in 1953. *Id.* at 644, 153 F.Supp. at 399. In defense, the government argued that the plaintiff's claims were barred by the six-year statute of limitations. *Id.* The Court of Claims found that the non-exportation agreement was continuing and that "each act of violation, whenever it occurred, would constitute a violation of the agreement." *Id.* The court held that the plaintiff's suit was not barred by the statute of limitations, but that recovery was limited to violations of the alleged agreement which occurred within the six-year statute of limitations. *Id.* at 645, 153 F.Supp. at 400.

A similar rule was applied in an Indian claims case in which Indian allottees alleged breaches of an ongoing governmental duty to act. In *Mitchell v. United States*, 10 Cl.Ct. 63, 77, *modified*, 10 Cl.Ct. 787 (1986), the court held that each government failure to fulfill a duty to sell timber at adequate prices or to replant trees "gave rise to a separate claim" and recovery was not barred for those claims occurring within the six-year statute of limitations period.

The government's attempts to show that the continuing contract theory does not apply are unavailing. The United States quotes a passage from the decision of the Claims Court in *Northern Paiute Nation v. United States*, 9 Cl.Ct. 639, 641 (1986), in support of its argument.[7] This passage, however, is taken out of context and is not applicable to this case. In *Paiute*, the plaintiff alleged a breach of a contractual agreement whereby the United States was to construct an irrigation system for plain-

tiff Indian tribe within a reasonable time after 1906. *Id.* at 640. Plaintiff argued that its claim was not barred on the ground that it had elected to continue the contract and had retained a claim for damages for partial breach, citing *Cities Service Helex, Inc. v. United States*, 211 Ct.Cl. 222, 234–35, 543 F.2d 1306, 1313 (1976). *Id.* at 640–41. The court found that *Helex* applied when both parties had continuing obligations under the contract, but that in *Paiute* only one side, the government, was under a continuing obligation to perform since plaintiff had already performed its part of the bargain. *Paiute*, 9 Cl.Ct. at 641. The court held, for the reasons explained in the quoted passage, that it was not correct to treat the contract as continuing. *Id.* Differentiating our case is that under the Repayment Contract both sides have continuing obligations. Therefore, the passage from *Paiute* quoted by the government is taken out of context and inapplicable.

Other cases cited by the government, *Cluett, Peabody & Co. v. Campbell, Rea, Hayes & Large*, 492 F.Supp. 67 (M.D.Pa. 1980), and *Dillon County School District v. Lewis Sheet Metal Works, Inc.*, 286 S.C. 207, 332 S.E.2d 555 (Ct.App.1985), are also distinguishable. In those cases, the plaintiffs alleged that the statute of limitations was tolled because the defendant was attempting to make repairs, the theory being that the plaintiffs waited to bring suit while the repair work was ongoing. Distinguishing those cases from the instant case is the fact that here the District is not alleging that the statute of limitations was tolled.

Because the alleged breach of the government's continuing duty to maintain the Project Works occurred within the six-year statute of limitations period, the Dis-

---

7. The passage quoted by the United States reads: The major problem with plaintiff's approach is its apparent premise that a contractual obligation continues indefinitely, notwithstanding a material breach thereof, until performance, repudiation or institution of a suit for total breach. This simply is not the law. Although an aggrieved party can, generally, await and insist on performance by the breaching party, the latter's obligation does not continue indefinitely. The breach gives rise to a cause of action, which, for example, if not acted upon within the period provided by the relevant statute of limitations, eventually become legally unenforceable.
*Paiute*, 9 Cl.Ct. at 641.

trict's cause of action based upon this alleged breach is not time-barred.

*Laches and Estoppel*

The United States also argues that the District's claim for damages arising from the lack of operational spillway gates during the 1983 flood is barred by the doctrine of laches and estoppel.

■ Laches disallows claims brought when unreasonable delay prejudices the defendant. *See S.E.R., Jobs for Progress, Inc. v. United States,* 759 F.2d 1, 9 (Fed. Cir.1985); *Foster v. United States,* 733 F.2d 88, 90 (Fed.Cir.1984); *Awtry v. United States,* 231 Ct.Cl. 271, 275–76, 684 F.2d 896, 898–99 (1982). The government contends: (1) that the District was unjustified in waiting until 1986 to bring this suit when it knew in 1961 that the original gates were inoperable, and (2) that the United States was clearly prejudiced by the delay. Defendant claims possible prejudice by theorizing that if the District had asserted and established its contractual right to working spillway gates when the problems first arose, the gates would have been fixed well in advance of the 1983 flood. The government asserts that it was further prejudiced by the fact that the District waited until substantial damages had occurred before filing suit. Defendant alleges that if the District had insisted, in advance of the 1983 flood, that the United States had a "maintenance" obligation to replace the gates and if the government had repaired the gates, then the District would have been required to pay half of the costs.

Similarly, the United States argues that the District's acquiescence to the BIA's performance under the Repayment Contract estopped the District from suing for damages attributable to the absence of operable gates. *See E. Walters & Co., Inc. v. United States,* 217 Ct.Cl. 254, 265, 576 F.2d 362, 367–68 (1978). As in *Walters,* the United States alleges, plaintiff's long silence in this case deprived the United States of "relatively painless alternative[s]" that could have been invoked if the rights now claimed had been established earlier. *Id.* at 265, 576 F.2d at 368; *see*

*Ling–Temco–Vought, Inc. v. United States,* 201 Ct.Cl. 135, 145, 475 F.2d 630, 637–39 (1973).

■ Laches and estoppel only apply, however, if the United States can show that it was prejudiced by the actions of the District. In order to show prejudice, the United States must demonstrate that the alleged delay caused the United States to change position. *See Bevelheimer v. United States,* 4 Cl.Ct. 558, 563–64 (1984) (there was no prejudice, and therefore laches did not apply, because the United States failed to show that the delay caused it to change position); *Ling–Temco–Vought,* 201 Ct.Cl. at 145, 475 F.2d at 636 (estoppel does not apply unless the United States has changed its position in reliance on plaintiff's actions). Although the United States argues that the government *would* have made the necessary repairs if the District had insisted that it do so, the court finds that this assertion amounts to nothing more than sheer speculation. The evidence reveals that representatives of the United States understood that the government had an obligation to provide a permanent replacement for the spillway gates. Defendant's App. at 172. Yet despite the 1983 flood, it is uncontroverted that permanent spillway gates have not been installed to this very day. Therefore, the position of the United States was not changed. The government was not prejudiced by the alleged delay. Laches and estoppel do not apply.

*Funds Available Clause*

■ The United States asserts that the Repayment Contract's funding proviso, also called a funds available clause, precludes liability for failure to install replacement gates for which the BIA never received funding. The funding proviso states:

Where the operations of this contract extend beyond the current fiscal year, the contract is made contingent upon Congress making the necessary appropriations for expenditures hereunder after such current year shall have expired. In case such appropriation as may be neces-

sary to carry out this contract is not made, the District hereby releases the United States from all liability due to the failure of Congress to make such appropriations.

This language was included in the Repayment Contract in accordance with the Anti-Deficiency Act.

This court finds that the argument of the United States is unavailing for several reasons. The United States cannot escape liability under the contract because the BIA did not attempt to obtain appropriations from Congress to repair the spillway gates. *See S.A. Healy Co. v. United States,* 216 Ct.Cl. 172, 188, 576 F.2d 299, 307 (1978) (holding that the "protective umbrella of the funds available clause ... does not extend to an exhaustion of funds occasioned by the agency's decision to request funding grossly inadequate to support the level of earnings approved by the agency for the fiscal year.").[8] Moreover, the operation and maintenance duty is not contingent upon Congressional appropriations. The release from liability extended to the United States under the funds available clause is limited to appropriations which are "necessary to carry out this contract ..." Both the Repayment Contract and the San Carlos Act provide that operation and maintenance costs shall be paid for out of landowner assessments.

*Duty to Operate and Maintain the Joint Works*

■ The Repayment Contract imposes a continuing duty on the United States to operate and maintain the entire Joint Works, to keep the Works, including the spillways and electrical generation system, in a state of repair and to safeguard against their failure. *See San Carlos,* 877 F.2d at 960. The District alleges that the United States breached the Repayment Contract by failing to adequately operate and maintain the Joint Works. The District seeks damages for one-half of the irrigation water lost and one-half of the electrical energy lost following the October 1983 flood. *Id.* at 959. To recover for breach of the Repayment Contract, the District must show: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach. *Id.* (citations omitted). The first two issues have been resolved, *id.* at 960, and the fourth issue of damages will be considered separately because the cause of action has been bifurcated by previous order of the court. Therefore, the remaining issue to be resolved at this stage is whether the United States breached its duty to operate and maintain the Joint Works. *Id.*

### 1. Allegations of Improper Maintenance

■ The District argues that the United States breached its general operation and maintenance duty by allowing the Dam to fail. Further, the District contends, specific contractual maintenance and operation obligations were breached which caused the Dam and switchyard failure in October 1983. In support, the District advances five different failures to operate and maintain. It alleges that the United States failed to maintain operable spillway gates,

---

8. In *Healy,* a contractor sued the United States for an equitable adjustment to compensate for losses incurred in the shutdown of work to be done by the contractor. Defendant points to the following passage of the opinion in hopes of persuading this court that *Healy* is inapplicable:

In order not to be misunderstood, we add at this point we are not holding that under this contract the defendant's executive branch was contractually obligated to request from defendant's legislative branch appropriations adequate to fund continued performance. It may well have been free to decide it would request any level it pleased. We hold ... that ... a contract will not be construed to throw all the cost and loss necessarily incident to such a decision on the contractor, and none of it on the party whose decision caused the loss, unless clauses of the contract require that result without ambiguity ...

216 Ct.Cl. at 188, 576 F.2d at 307. Contrary to the assertions of the defendant, the Repayment Contract does not unambiguously "throw all the cost and loss necessarily incident to" a decision not to seek funding on the contractor. Hence, *Healy* applies, and because the BIA did not pursue funding for spillway gate replacement, the

the powerhouse wall, the tailrace channel,[9] the electrical switchyard, and the penstocks. The United States, on the other hand, argues that the District's allegations of improper maintenance are insufficient to defeat the government's motion for summary judgment. This court now examines the allegations of improper maintenance to determine whether the United States breached its contractual duty.

### a. Spillway Gates

Both parties agree that the immediate cause of the Dam's complete shutdown and failure in October 1983 was the settlement of the switchyard. Tailwater from the spill of October 1983 backed up through the powerhouse wall into the switchyard, undermining the switchyard. As stated in the government's brief:

> The United States agrees with one premise of the spillway gate theory: that the switchyard would not have been undermined but for the release of water down the spillways. Attribution of the switchyard damage to high tailrace waters, unlike theories implicating leakage from the penstocks or from the structure of the Dam, provides a logical explanation for the coincidence of unprecedented water levels and the settlement of the switchyard floor. The United States has submitted extensive documentary and testimonial evidence establishing that high water levels in the tailrace undermined the switchyard floor and that these high water levels resulted from the placement of the two spillway chutes directly opposite one another at the point where they emptied into the tailrace and from the unprecedented rate of release from the Coolidge Dam during the flood. Pl.App. 177; Def.App. 81–82, 128–133. While the alleged link between the absence of the working gates and the undermining of the switchyard may be plausible on the present record, it is also, as the preceding discussion demonstrates, time-barred.

This court, as stated previously, holds that the failure to maintain operable spillway gates theory is not time-barred nor precluded by laches or estoppel. The evidence reveals that representatives of the United States understood that the government had an obligation to provide a permanent replacement for the spillway gates. Yet despite the 1983 flood, it is uncontroverted that permanent spillway gates have not been installed to this very day. There are no genuine issues of material fact in dispute with regard to the inadequate operation and maintenance of the entire Joint Works because of the failure to install operable spillway gates.

### b. Powerhouse Wall

The District claims that the United States breached the Repayment Contract by failing to maintain the powerhouse wall. Two witnesses testified in depositions that there were holes in the powerhouse wall, and that tailwater entered the switchyard through these holes during the 1983 flood. Reapard A. Justice, Power Manager at the Dam from January 1983 to April 1984 testified in his deposition that during the spill of October 1983, the bypass needle valves located on the downstream side of the powerhouse were about 75 percent under water. He stated that tailwater invaded the switchyard through six to seven inch holes around one of the needle valves. These holes, Justice said, were not a normal condition, he "could look down ... through the void itself and see the surface of the tailrace water." James Dennie, the Dam Operator at the Dam for the BIA from July 1978 to December 1986, concurred in the belief that a cause of the switchyard settlement was spill water entering the switchyard through "voids" or holes in the downstream powerhouse wall. He testified that the holes were in the concrete around one of the bypass outlet valves, and that they were caused by repeated removal of the valve previously for repair. Dennie ex-

funding proviso does not preclude the District from suing for breach of contract.

9. Tailrace is the phenomenon in which the release of large quantities of water into a restricted area causes the water to move upstream, or in this case, towards the Dam.

plained that the holes were not sealed because, until 1983, water had not "backed" that high. He believed that possibly a yard of cement would have repaired the holes. No precautions were taken to make sure that a high tailrace would not infiltrate through the holes into the switchyard.

The United States contends that allegations of improper maintenance of the powerhouse wall are entirely unsupported. However, as stated above, the District presents substantial evidence that the powerhouse wall was inadequately maintained. The United States does not present evidence to refute the District's evidence. Bald assertions by the government that the District's claim is unsupported are not sufficient to preclude summary judgment. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (stating that "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts"); *Jechura v. United States,* 9 Cl.Ct. 753, 754 (stating that "mere unsupported assertions are insufficient to overcome sworn material and to prevent the award of summary judgment"), *aff'd,* 809 F.2d 791 (Fed.Cir.1986).

### c. Tailrace channel

The District asserts that the United States failed to maintain the tailrace channel downstream of Coolidge Dam. The District submits as evidence that in September 1980 the United States Bureau of Reclamation (USBR), following a Safety Evaluation of Existing Dams (SEED) examination, warned the BIA that spillway releases could have serious backwater effects on the powerhouse. The USBR said:

> Information on tailwater studies is not available. The restricted channel and flood plain dimensions of the canyon downstream undoubtedly would result in high tailwater under high flow conditions of near IDF magnitude. Backwater problems would result at the powerhouse and may prevent access during major spillway discharges. Extensive studies, including backwater computations, are required to determine water surface profiles in the reach downstream from the Dam during IDF conditions and the effects on the powerhouse.

There is no evidence in the record that the recommended studies were ever conducted. In addition, after the October 1983 spill, the USBR again examined the Dam and recommended "... that as soon as practicable project forces trim the channel areas below the spillway outlets to facilitate flow. This will improve the downstream conditions and possibly improve tailwater levels during spill conditions." There is no evidence that any trimming or widening of the river channel took place. The United States asserts that the allegations of the District of improper maintenance of the tailrace channel are unsupported, but again fails to refute the evidence submitted by the District.

### d. Electrical Switchyard

As stated previously, both parties agree that the immediate cause of the Dam's complete shutdown and failure in October 1983 was the settlement of the switchyard. Tailwater from the spill of October 1983 backed up through the powerhouse wall into the switchyard, undermining the switchyard. The District submits evidence that before 1983 the switchyard floor was in a deteriorating condition which contributed to the shutdown and failure after the spill. In December 1978, the BIA had been fully informed by its own personnel of the switchyard's dangerous condition:

> The dirt floor in the switch at the base of the Dam is sinking or settling in various places. There is evidence of the wooden structural members buried for some unknown reason in the floor. These are rotting out and permitting the dirt floor to cave into some unknown void.

The same personnel also recommended that "[a]n immediate survey should be accomplished to ascertain the reason for the present floor condition and recommendations for repairs." There is no evidence that this survey was ever completed or that any repairs were ever made. After the initial spill in October 1983, the USBR found debris still buried in the switchyard

fill. Reapard A. Justice testified in deposition that he was aware, sometime prior to October 1983, of settling in the switchyard because of rotting timbers buried in the fill which allowed the dirt to fall down "into that void," and that there was never "any kind of excavation or anything like that to clear it out." The United States does not effectively dispute this evidence.

### e. Penstocks

Finally, the District contends that the United States failed to maintain the penstocks. The District submits that in September 1980, the USBR reported:

> Considerable scaling and corrosion were observed in the conduit and penstock. The depth of this corrosion could not be determined precisely; however, scales of up to ¼-inch thickness were pulled from the conduit surfaces. An estimated 75 percent of the rivet heads were eroded flush with the conduit. Remaining rivet heads are all corroded ...

The condition of the penstocks was identified as a "potential threat to human life." Plaintiff's App. at 208. Yet there is no evidence in the record that this condition was corrected before the 1983 Dam failure. The District's expert, Alton McQueen, opined that leakage from the badly deteriorated penstocks possibly caused the settlement in October 1983.

The United States effectively raises doubt as to the allegations of improper maintenance of the penstocks. The District's witnesses stated in deposition that neither had even seen the plant before 1986, one admitted he did not have enough information on which to make a determination as to cause, and both testified that penstock leakage "could" have caused the settlement. However, the United States submits evidence, based on the observations of Project personnel who monitored the operation of the reopened penstocks in late 1983 and of experts present when the penstocks were later disassembled, that the penstocks did not fail and could not have caused the switchyard to settle. No leaks were found in the penstocks after they were removed in 1985. As the United States points out, consistent with the interpretation of undisputed facts adopted by this court, the switchyard settlement occurred because the unexpectedly high tailwater in the channel below the Dam backed up, filled the power plant, and migrated into the switchyard. This analysis is inconsistent with the theory that penstock leakage was a cause of the Dam's failure.

### 2. Breach of Duty

The issue of the alleged breach of the duty to operate and maintain the entire Joint Works is before the court on cross-motions for summary judgment. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. RUSCC 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Viewing the evidence in the light most favorable to the defendant, this court concludes that there are no genuine issues of material fact with regard to breach of its duty to operate and maintain the entire Joint Works, to keep the Works, including the spillways and electrical generation system, in a state of repair and to safeguard against their failure. As a matter of law, this court finds that the United States breached its general operation and maintenance duty by allowing the Dam to fail, and breached its specific contractual maintenance and operation obligations which caused the Dam and switchyard failure in October 1983.

The undisputed evidence reveals that the United States did not keep the Works, including the spillways and electrical generation system, in a state of repair and guard against their failure. The District presented substantial evidence of improper maintenance of the powerhouse wall, the tailrace channel, and the electrical switchyard. The government either claimed that these allegations were unsupported or presented no evidence to dispute them. These contentions are not sufficient to preclude summary judgment for the District. *See Mat-*

*sushita Electric Industrial Co.,* 475 U.S. at 586, 106 S.Ct. at 1355; *Jechura,* 9 Cl.Ct. at 753–54.

This court also finds that the United States breached its general operation and maintenance duty by allowing the Dam to fail. The District submitted uncontroverted evidence that the Dam failed because of improper operation and maintenance. The parties agree that the Dam failed because of switchyard settlement caused by high tailwater resulting from the 1983 spill. The District operated the Dam without spillway gates at this time. This court holds that the spillway gate theory is not time-barred nor precluded by laches or estoppel. The United States breached the Repayment Contract by operating the Dam without operable spillway gates and allowing the Dam to fail.

With regard to overall maintenance, as stated by the Project Engineer in April 1983, there had been "essentially no preventative maintenance of the power system and Coolidge Dam." In April 1983, the Power Manager of the Dam reported:

> I can find no reason to believe significant efforts have been made to adequately maintain or repair our existing equipment for the last 15 years, or longer. As a result of this lack of attention, *our system appears to be on the verge of major collapse.* From a pure technical standpoint, I believe virtually every major feature of the SCIP Power Program is in need of complete overhaul or replacement.

(Emphasis added). After a comprehensive technical review of the information and materials produced by discovery in this case, the District's engineering consultant, who was experienced with the inspection, maintenance and repairs of hydroelectric dams, opined that the power plant failed in 1983 as a result of the BIA's lack of proper maintenance. While the United States raises doubt as to whether the leakage from improperly maintained penstocks was a cause of the Dam's failure, it is undisputed

that the spillway gates, the powerhouse wall, the tailrace channel, and the electrical switchyard were improperly operated and maintained and that the 1983 failure and shutdown of the Dam were the result of improper operation and maintenance.[10]

The undisputed evidence, added together, leads this court to conclude that as a matter of law the United States breached its specific and general duties to operate and maintain the entire Joint Works, to keep the Works, including the spillways and electrical generation system, in a state of repair and to safeguard against their failure.

### CONCLUSION

This court concludes that there are no genuine issues of material fact in dispute regarding the United States' breach of duty to maintain and operate the entire Joint Works. The District's claims are not time-barred, not precluded on equitable grounds, and not prevented by the funds available clause. As a matter of law, the United States breached the Repayment Contract by failing to operate and maintain the Joint Works. Therefore, the defendant's renewed motion for summary judgment is denied, and the plaintiff's cross-motion for summary judgment is granted.

---

10. The court reserves judgment on whether the consequential damages claimed by the District were caused by the United States' breach of its contractual duty. Because this cause of action has been bifurcated by previous order of the court, the damages issue will be addressed in a separate proceeding. *See San Carlos,* 877 F.2d at 959–60.