**E. WALTERS & COMPANY, INC.**

v.

**The UNITED STATES.**

**No. 286–76.**

United States Court of Claims.

May 17, 1978.

Robert Bruce Shearer, Dayton, Ohio, for plaintiff; Shearer & Garrett, Dayton, Ohio, of counsel.

Gerald L. Schrader, Washington, D.C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

This case comes before the court on plaintiff's request, filed December 7, 1977, for review by the court of the recommended decision of Trial Judge Louis Spector, filed November 10, 1977, pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment, having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, with a minor modification, as hereinafter set forth, it hereby affirms and adopts the recommended decision, as modified, as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover and, accordingly, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed.

---

\* The trial judge's recommended decision and conclusion of law are submitted in accordance

## OPINION OF TRIAL JUDGE \*

SPECTOR, Trial Judge: This contract case originates in an Invitation for Bids (IFB) issued by the Department of the Army on September 28, 1971, for the procurement of 22,324,100 M48A3 fuzes. It is important to a decision in this case to observe that funds for the entire quantity had been authorized before the IFB was issued.

One-half of this quantity (11,162,050) was designated as a so-called labor surplus area set-aside. The non set-aside portion was scheduled to be awarded first.

The IFB invited prospective bidders to purpose unit prices on any or all of specified quantities, within certain ranges, as follows:

| | | | |
|---|---|---|---|
| Range A, | 3,000,000 | to | 4,000,000 |
| Range B, | 4,000,001 | to | 5,000,000 |
| Range C, | 5,000,001 | to | 6,000,000 |
| Range D, | 6,000,001 | to | 7,000,000 |
| Range E, | 7,000,001 | to | 8,000,000 |
| Range F, | 8,000,001 | to | 9,000,000 |
| Range G, | 9,000,001 | to | 10,000,000 |
| Range H, | 10,000,001 | to | 11,000,000 |
| Range I, | 11,000,001 | to | 12,000,000 |

Award of the non set-aside portion (which is directly involved in this case) was further governed by the following "award note:"

Selection of the successful offeror or offerors for the non set-aside will be made on the basis of the lowest price (after all appropriate evaluation) for a single award *or multiple awards.* [Emphasis supplied.]

Deliveries were scheduled to be made in 12 approximately equal monthly installments, beginning in February 1972.

The dispute herein centers around a reservation in the IFB, affording the Government an option to increase the quantities awarded, in the following language:

The Government reserves the right to increase the quantity of each Range awarded by a quantity of up to and including, but not exceeding 50% and at the price specified in the schedule or at the Price(s) quoted below, whichever is lower,

---

with Rule 166(c). The necessary facts are stated in the opinion.

unless a lower unit price is negotiated in consideration of the increased quantities. Delivery of the items to be added by the exercise of this option provision *may be made concurrent* with or follow immediately after deliveries called for under this contract. Production on a concurrent basis shall not exceed 50% of the maximum monthly schedule of the basic award. The Contracting Officer may exercise this option at any time prior to 30 Nov 72 by giving written notice to the Contractor. Subject to the limitations contained in this paragraph, the Government may exercise this option *on one or more occasions.* [Emphasis supplied.]

On the procedure to be followed in evaluating bids, the IFB further provided that:

If the Government elects *to exercise an option simultaneously with award,* bids or proposals will be evaluated for purposes of award on the basis of the total price for the basic quantity and the option quantity exercised with award. [Emphasis supplied.]

Plaintiff was one of nine bidders responding to the IFB. Its prices within each range were the same for both the basic and option quantities:

| | | | | |
|---|---|---|---|---|
| Range A | 3,000,000 | to | 4,000,000 | |
| Rail | | | | $1.255 |
| Motor | | | | 1.251 |
| Range B | 4,000,001 | to | 5,000,000 | |
| Rail | | | | $1.252 |
| Motor | | | | 1.248 |
| Range C | 5,000,001 | to | 6,000,000 | |
| Rail | | | | $1.240 |
| Motor | | | | 1.236 |
| Range D | 6,000,001 | to | 7,000,000 | |
| Rail | | | | $1.236 |
| Motor | | | | 1.232 |
| Range E | 7,000,001 | to | 8,000,000 | |
| Rail | | | | $1.396 |
| Motor | | | | 1.392 |
| Range F | 8,000,001 | to | 9,000,000 | |
| Rail | | | | $1.394 |
| Motor | | | | 1.390 |
| Range G | 9,000,001 | to | 10,000,000 | |
| Rail | | | | $1.389 |
| Motor | | | | 1.385 |
| Range H | 10,000,001 | to | 11,000,000 | |
| Rail | | | | $1.389 |
| Motor | | | | 1.385 |
| Range I | 11,000,001 | to | 12,000,000 | |
| Rail | | | | $1.389 |
| Motor | | | | 1.385 |

The price jump at Range E is significant. It represents the point at which plaintiff would have had to acquire additional tooling and floor space to produce quantities in excess of Range D.

Plaintiff was at the time of bidding in agreement with the Government's interpretation of the option clause above-quoted, to this extent at least. It acknowledges that the clause gives the Government the right to require delivery of a 50 percent option quantity *concurrently* with the base award, *if* efforts to award the basic quantity have been exhausted. Accordingly, it was within plaintiff's contemplation that it could be awarded a Range F (8,000,001 to 9,000,000) quantity at a Range D (6,000,001 to 7,000,-000) price, by award of an option quantity equal to the difference between the two ranges.

By bidding in all ranges, for example, plaintiff was risking award to it of the full 11,162,050 non set-aside quantity, plus an option quantity of up to 5,581,025 (one-half of 11,162,050), or a total of 16,743,075 fuzes, all for delivery in 12 monthly installments. It is very doubtful that plaintiff could have produced that quantity within the required time. Testimony before the Armed Services Board of Contract Appeals (on appeal from an adverse contracting officer's decision) indicates plaintiff was gambling that the Government would limit any award to a particular contractor's capacity, as determined in a preaward survey to be conducted by the Government. The Government did thereafter conduct such a survey, and found that plaintiff's capacity was 758,000 units per month, or a 12-month capacity of slightly over 9 million units.[1]

---

1. Plaintiff now argues that the Government's surveys found it capable of producing the entire 11,162,050 units. It directs attention to the following statement in the "Remarks" box of "Section III Factors to be Investigated and Investigation Results" in the November 12 and 23, 1971 surveys: "Capability to perform in all ranges bid." The board found, however, that the Government's surveys determined plaintiff's capacity to be 758,000 units per month. There are statements to this effect in the reports. Therefore, and because the statement

After opening of the bids, the Government conducted a price analysis to determine what award or combination of awards would result in the lowest total cost to the Government.[2] The analysis was conducted with awareness of the fact that no bidder had the capability of producing the entire 11,162,050 non set-aside quantity, so that at least two awards would be required to procure that quantity. Since the minimum awardable quantity under the IFB was 3 million (Range A), the maximum quantity awardable to plaintiff was 8,162,050. This quantity fell within Range F, for which plaintiff's bid of $1.394 (shipment by rail) was low. However, noting the price jump at Range E, the Government chose to award plaintiff a total of 8,162,050 by awarding it the maximum number (7 million) at its Range D price of $1.236 (rail), plus a simultaneous quantity of 1,162,050 for concurrent delivery at the same price, under the "option" clause above-quoted. Plaintiff's Range D price was also low for that range. The contracting officer considered this to be a proper and permissible exercise of the option provision. Plaintiff's argument is essentially that it represented sharp practice, not contemplated by the IFB in evaluating bids for the *basic*, fully-funded quantity to be procured. For example, "(n)owhere in this award are bidders informed that Range B is really Range A plus fifty (50%) per cent of Range B. * * "

The remaining 3 million units of the non set-aside quantity were then awarded to Walter Kidde & Co. at its Range A price of $1.24. The Government's price analyst testified that had the option provision been deemed unavailable for procuring the basic quantity of 11,162,050 units, then 7 million units would have been awarded to plaintiff at the Range E price, and 4,162,050 to Walter Kidde at $1.24 (which was also its

Range B price). This would have produced the second most economical award combination from the standpoint of the Government. This combination would have cost the Government far less than an award of 8,162,050 to plaintiff at its Range F price, coupled with a 3 million unit award to Walter Kidde at its Range A price.

When plaintiff learned in December 1971 that it was being awarded a Range F quantity at a Range D price, its representative telephoned the contracting officer for an explanation. Plaintiff was advised that the 1,162,050 portion was an "option" quantity, and that award in this manner was "in the best interest of the Government." Plaintiff did not protest further at this time because it believed that exercise of the option had occurred only after award of the entire basic quantity and that the award as made, therefore constituted the exercise of what it at that time regarded as a "legal option." In plaintiff's view, an "option" could be exercised only if the entire 22,324,100 units (both set-aside and non set-aside) had been awarded. It believed that only amounts in excess of the entire 22,324,100 units were "option" amounts that could be awarded under the option provision.

This belief on the part of plaintiff was based on the fact, noted at the beginning of this opinion, that the 22 million fuzes were firm, fully-funded requirements, and the additional important fact that section 1–1503(b) of the Armed Services Procurement Regulations (ASPR), prohibited the use of "option" clauses for procurement of firm, fully-funded requirements, as follows:

Option provisions and clauses shall *not* be included in contracts when—

\* \* \* \* \* \*

(v) the *option quantities represent known firm requirements for which*

---

plaintiff refers to is ambiguous as to whether it was a "factor to be investigated," or a "result of investigation," it is concluded that the board's finding on this point is supported by substantial evidence.

**2.** As the "award note" earlier quoted provides, multiple awards to achieve lowest overall price

were contemplated by the IFB. Thus, even if plaintiff had the capacity of producing all 11,-162,050 units, it could have expected award of that quantity only if its price for Range I was less than that of any other possible combination of awards to the various bidders.

*procurement funds are available.* \* \* [Emphasis supplied.]

Nevertheless, plaintiff did not inquire as to whether the entire 22 million fuzes had been awarded prior to exercise of the option, or whether in the alternative the option quantity was part of a firm, fully-funded requirement. In any event, the Government representatives made no misrepresentation as to those facts.

As earlier stated, on December 7, 1971, plaintiff was awarded a contract to produce 8,162,050 fuzes at a price of $1.236. The contract explained that the total quantity awarded included the exercise of an option for concurrent delivery, in the amount of 1,162,050 fuzes.

By letter of January 13, 1972, the Government notified plaintiff of all other awards made under the IFB up to that time. The letter stated, in part:

d. Name of firms receiving awards, prices, and quantities:

| Contractor | Unit Price | Quantity |
|---|---|---|
| Non-Set-Aside Awards | | |
| E. Walters Co., Inc. | | |
| Elk Grove Village, Ill. | $1.236 | 8,162,050 |
| Walter Kidde & Co., Inc. | | |
| Belleville, New Jersey | 1.24 | 3,000,000 |
| Set-Aside Award | | |
| Keystone Micro-Scan, Inc. | 1.20352 | 6,000,000 |

Upon completion of the Set-Aside quantities you will be advised accordingly.

It became evident to plaintiff upon receipt of the January 13, 1972 letter that the option quantity awarded it was part of the 22 million firm, fully-funded basic quantity, and was not, therefore, what it had regarded as a "legal option." It is noteworthy, however, that plaintiff did not protest the Government's use of the option provision at that time. Its representative elected to remain silent, and to postpone any protest, due to fear that a protest at that time would bring "the wrath of the Government" upon it, in light of delinquencies in delivery of which it was aware. Plaintiff does not contend, however, that its silence and its failure to protest was the product of any threats, intimidation or economic duress originating with Government representatives.

When the Government was unable to award the remainder of the set-aside portion, it exercised the option provision in all three contracts awarded up to that time. Keystone received a maximum option of a 50 percent increase, *i. e.,* 3 million units. On February 23, 1972, plaintiff's quantity was increased by an additional option quantity of 937,500 fuzes, bringing its total award to slightly more than 9 million, that being its maximum capacity of 758,000 fuzes per month. Walter Kidde received the remainder of the set-aside quantity.

It is noteworthy that plaintiff did not protest this second exercise of the option provision in its contract. Although the additional award still represented part of the basic 22 million firm, fully-funded quantity, plaintiff apparently does not protest this second exercise of the option clause because the Government had by then been unable to place the remainder of the set-aside portion, and had therefore been unable to fulfill its basic requirements without resort to options.

In September 1972, plaintiff first mentioned that it deserved its Range F price rather than its Range D price. This occurred at a meeting with the contracting officer that was primarily concerned with the subject of deliveries. Plaintiff did not, however, ask the Government to correct the price at that time.

In December of 1973, 6 months after final deliveries under the contract had been completed, but before final payment, plaintiff made its first formal, written claim for an increase in the contract price to its Range F price of $1.394. The contracting officer issued a final decision denying plaintiff's claim on March 26, 1974, and plaintiff duly appealed to the Armed Services Board of Contract Appeals.

Plaintiff's appeal was denied[3] on the grounds that any claims stemming from the

---

3. 76-1 BCA 11,767. Plaintiff seeks review against the standards set forth in the Wunder-

lich Act, 41 U.S.C. §§ 321–22 (1970). The petition also seeks reformation and a trial on that

Government's exercise of the option clause had been waived by performance without protest until after final delivery.

Plaintiff urges here that the Government's initial use of the option provision violated both the letter and spirit of the ASPR provision as above-quoted, and that, therefore, plaintiff is entitled to recover losses resulting from the violation, namely, the difference between its Range D and Range F prices over the entire contract quantity.

The argument is not valid. Granted that this use of the "option" provision was clearly prohibited by the procurement regulations, and for good and sufficient policy reasons,[4] the fact that a procurement practice is prohibited does not necessarily mean that it is therefore actionable. The discipline to be administered in such cases is a responsibility of the cognizant procurement officials within the agency in which the violation took place. It is not a type of discipline to be administered by this court,

in the form of judgment for the party allegedly aggrieved by the violation of the procurement regulation.

Were the provision in question susceptible to an interpretation rendering it in harmony with that procurement policy, such an interpretation would naturally be favored over an interpretation placing it in direct conflict with that expressed procurement policy.[5] The "option" clause in this case, however, is not susceptible to more than one reasonable interpretation.[6] Therefore the ASPR provision is of little help to plaintiff.

Nor did plaintiff timely protest the exercise of the first option. The board opinion is correct in characterizing this silence until after final delivery, as a waiver.[7] By January 13, 1972, plaintiff knew of all awards made to that date. Any misunderstanding on plaintiff's part with regard to how defendant viewed the option clause, ended with receipt of the Government's letter specifying the award pattern. Testimony

issue, which was beyond the board's jurisdiction. In its present motion, the reformation issue is not mentioned, and argument is limited to an attack on the legal conclusions in the board's decision.

4. ASPR sections 1–1503(b) and 1–1506 (now 7–104–27). The board finds those sections to be clearly inconsistent with the procurement procedures followed here, and that "the clause itself is patently unfair to bidders, especially where, as here, concurrent delivery of the option quantities required expansion of facilities." The policy expressed in the ASPR is to deter contingency costs in proposals by prospective bidders, who are otherwise required to consider the additional cost of producing the base quantities. In addition, a bidder faced with the contingency of a concurrent "option" quantity, has this dilemma to contend with: Should he limit his bid for base quantities to an uneconomical portion of his capacity, in order to leave room for a possible additional "option" award; or bid to capacity, thus risking an "option" award in excess of capacity? When employed as here, to award base quantities by "option," the provision has a potential for generating disputes, such as has occurred here. The board even suggests that use of the options clause may have been "unlawful," but finds it unnecessary to decide that question. *See, G. L. Christian & Associates v. United States,* 312 F.2d 418, 160 Ct.Cl. 1, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), which

is cited by plaintiff on this issue. Defendant replies that the ASPR provision does not render use of the option provision illegal, because it "is intended to protect the interests of the Government."

5. For example, where a specification is written around the product of a specific manufacturer, in contravention of a procurement regulation prohibiting restrictive specifications, because they inhibit competition. In such a case, it might be appropriate to interpret the specification in harmony with the regulation, since this would fulfill the intent of the regulation to foster maximum competition.

6. It is interesting to observe, however, that the board opinion finds the second sentence of the "option" clause susceptible to another interpretation. It states:

"Were we called upon to interpret this language we might well find that it did not authorize the Government to require appellant to deliver the option quantities concurrently with the basic quantity awarded. However, that question is not before us. Appellant has not alleged that the option provision is ambiguous."

7. Cf. *Federal Electric Corp. v. United States,* 486 F.2d 1377, 202 Ct.Cl. 1028 (1973), *cert. denied,* 419 U.S. 874, 95 S.Ct. 136, 42 L.Ed.2d 113 (1974).

before the board indicates that plaintiff was aware that it had a possible claim for the difference between the Range D and Range F price soon after the arrival of that letter. But it chose to remain silent, to postpone any protest, and to fully perform the contract as if there were contemporaneous agreement of the parties on the proper interpretation of the terms of the IFB. Plaintiff's telephone inquiry in December 1971 as to why it had received a Range F quantity at a Range D price was insufficient, without more, to constitute a formal protest. Similarly plaintiff's mere "mentioning" in September 1972 that it deserved the Range F price was insufficient and, in any event, was too late. By that time, the Government had been prejudiced in consideration of other alternatives. No recognizable and formal protest was forthcoming until December 1973, 2 years after the letter of award, and approximately 6 months after final delivery under the contract.

In these circumstances, the doctrine of estoppel is also for application. Had plaintiff protested the use of the option provision at the time of award, defendant would have been in a position to either reaffirm its use of the option provision, in apparent disregard of the ASPR prohibition, with the further knowledge that it could later be faced with a claim for the Range F price, at an additional cost of over $1 million; or it could have elected instead, to award the non set-aside quantity in the next least expensive manner, as previously discussed. This would have consisted of an award of 7 million units to plaintiff at its Range D price, and of 4,162,050 units to Walter Kidde at a price of $1.24. That combination of awards was only about $5000 above the combination actually employed.[8] Plaintiff's silence deprived the Government of

that relatively painless alternative.[9] This case is analogous to those in which it is found that the Government is presumed to have elected not to terminate a delinquent contractor for default, because it permitted the due date to pass in silence and without action, thereby encouraging the contractor to continue performance and to incur additional costs.[10]

All of the foregoing considered, it is determined that the board's findings of the relevant facts are supported by substantial evidence in its record, and that its conclusions on the legal issues are correct. Plaintiff's motion for summary judgment is denied, defendant's cross-motion is granted, and the petition is dismissed.

---

8. The $5000 difference is calculated by determining the difference between Walter Kidde's price ($1.24) and plaintiff's Range D price ($1.236) and multiplying this $.004 difference by the 1,162,050 quantity that would have been awarded to Walter Kidde instead of plaintiff under the second least expensive alternative.

9. *See & cf. Ling-Temco-Vought, Inc. v. United States*, 475 F.2d 630, 201 Ct.Cl. 135 (1973).

10. *See*, for example, *DeVito v. United States*, 413 F.2d 1147, 188 Ct.Cl. 979 (1969), and its progeny.

*See also Northern Helex Co. v. United States*, 455 F.2d 546, 197 Ct.Cl. 118 (1972), for a discussion on waiver, in a somewhat different context involving a breach of contract.