**CONOCOPHILLIPS, Conoco, Inc., and Phillips Petroleum Company, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 02–1367C.

United States Court of Federal Claims.

Sept. 12, 2006.

J. Keith Burt, Mayer Brown, Rowe & Maw LLP, Washington, DC, attorney of record for plaintiffs.

Steven J. Gillingham, with whom were Assistant Attorney General Peter D. Keisler, Director David M. Cohen, and Kyle Chadwick, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. Donald S. Tracy

and Howard M. Kaufer, Defense Energy Support Center, Ft. Belvoir, VA, of counsel.

## OPINION

WIESE, Judge.

Plaintiffs sue here to recover the difference between the claimed fair market value and the contract price of fuel delivered to the Defense Energy Support Center ("DESC") under a series of contracts alleged to have contained illegal economic price adjustment clauses. The case is before the court on defendant's motion to dismiss or, alternatively, for summary judgment and on plaintiffs' motion pursuant to RCFC 56(f) to permit further discovery. The court heard oral argument on the parties' motions on August 9, 2006. For the reasons set forth below, we rule in defendant's favor and additionally deny plaintiffs' RCFC 56(f) motion.

## BACKGROUND

Between 1984 and 1999, Conoco, Inc., and Phillips Petroleum Co.[1] entered into 41 contracts with DESC to provide jet and motor vehicle fuel for use by the United States armed forces. Under the solicitations for these contracts, the pricing of the fuel was governed by DESC-drafted economic price adjustment ("EPA") clauses. Pursuant to these clauses, bidders were instructed to propose a base price per gallon for each petroleum product to be supplied, which would in turn be adjusted monthly based upon average sales prices of refined petroleum products by region as reported by the Department of Energy in its publication the *Petroleum Marketing Monthly* ("PMM").

DESC's reliance on such price adjustment clauses came under attack, however, in a lawsuit filed in this court in late 1989. In *MAPCO Alaska Petroleum, Inc. v. United*

States, 27 Fed.Cl. 405, 410 (1992), the court struck down the use of a PMM-based EPA clause, finding it in violation of the Federal Acquisition Regulations ("FAR") since the PMM index constituted "an amalgamation of the previous month's petroleum sales data," and did not therefore reflect a "contractor's established prices" as contemplated by 48 C.F.R. (FAR) § 16.203 (1994).[2] Following the *MAPCO* decision, DESC sought and received permission to deviate from the FAR in order to continue its use of EPA clauses similar or identical to the one struck down by the court. In 1995, however, DESC replaced the PMM index with the widely used Platts Oilgram Price Report ("Platts") and the Oil Price Information Service ("OPIS") as the basis for its EPA escalators—a change that allowed DESC to make its monthly adjustments (and hence monthly payments) without the three-month delay in price reporting associated with the PMM.[3]

Plaintiffs filed suit in this court on October 9, 2002, styling their complaint on the holding in *MAPCO* and seeking the difference between the claimed fair market value of the fuel they delivered to DESC and the contract price they received for that fuel. Defendant in turn moved for summary judgment with respect to two issues: whether the EPA clauses at issue violated the FAR and whether plaintiffs had waived any rights they may have had to challenge the EPA clauses contained in their contracts. At the parties' request, however, the court suspended proceedings pending the outcome of the interlocutory appeal in *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339 (Fed.Cir.2005), which involved the consolidation of two virtually identical fuel cases—*Tesoro Hawaii Corp. v. United States*, 58 Fed.Cl. 65 (2003), and *Hermes Consol., Inc. v. United States*, 58 Fed.Cl. 409 (2003)—each of which, like

1. Conoco and Phillips merged in 2002 under the parent company ConocoPhillips, the third largest integrated energy company in the United States and the sixth largest publicly owned energy company in the world.

2. All citations to the FAR are to the 1994 edition.

3. By statute, all refiners of fuel, including plaintiffs, were required to report petroleum sales to the Department of Energy, which in turn pub-

lished the corresponding sales prices on a monthly basis. Because the compilation of these sales prices was not available until three months after the sales had taken place (*e.g.*, sales prices for January were published in May), however, DESC handled the monthly contract price adjustments by making an estimated interim payment which it later reconciled with the proper amount due when the PMM data became available.

*MAPCO*, had held a PMM-based EPA clause to be illegal.[4]

In the resulting decision, the Federal Circuit abrogated the holding in *MAPCO*, explicitly rejecting the proposition that an EPA clause was required under the FAR to be based on a contractor's own established fuel prices and upholding DESC's use of an EPA clause based on the PMM. *Tesoro*, 405 F.3d at 1348. In light of that ruling, we allowed plaintiffs to amend their complaint to assert a cause of action based on FAR § 15.802(b) (currently codified at FAR § 15.402(a)), a provision setting forth the contracting officer's duty to ensure that prices offered are fair and reasonable. Plaintiffs now seek discovery concerning the negotiation, award, and performance of the fuel contracts, as well as the prices and indexes contained in those contracts. Defendant, for its part, maintains that there exists no triable issue of fact and accordingly asks the court to dismiss paragraph 46 of plaintiffs' second amended complaint (challenging DESC's minority-owned business bidding preferences on equal protection grounds) pursuant to RCFC 12(b)(1) (lack of subject matter jurisdiction) and the remainder of the complaint pursuant to either RCFC 12(b)(6) (failure to state a claim upon which relief can be granted) or RCFC 56(b) (summary judgment).

## DISCUSSION

The use of fixed-price contracts with economic price adjustments is governed by FAR § 16.203–1, which provides in part:

A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:

(a) *Adjustments based on established prices.* These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.

(b) *Adjustments based on actual costs of labor or material.* These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.

(c) *Adjustments based on cost indexes of labor or material.* These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

Use of the clauses identified in FAR § 16.203–1 is limited by FAR § 16.203–3, as follows:

A fixed-price contract with economic price adjustment shall not be used unless the contracting officer determines that it is necessary either to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices.

At issue in the instant case is the first of the EPA clauses identified above—those containing adjustments based on "established prices." In the initial round of briefing, plaintiffs argued that the phrase "established prices" as set forth in FAR § 16.203–1 should be understood to mean the "contractor's established prices" as contemplated by FAR § 16.203–3.[5] Under that reading, price

---

4. Despite its determination that the PMM-based clause was illegal, the *Hermes* court declined to rule in the contractor's favor because it concluded that the contractor had waived its claim. 58 Fed.Cl. at 419. Although the issue of waiver, like the issue of the PMM-based EPA clause's legality, was certified for interlocutory appeal, the Federal Circuit disposed of the case on the basis of the latter issue and did not therefore reach the question of waiver.

5. Plaintiffs' argument was predicated in part on the fact that the earlier version of the regulations, contained in Defense Acquisition Regulation ("DAR") § 3.404–3 (1981), listed the section containing the phrase "contractor's established prices" before the section outlining the various types of EPA clauses. Because no substantive change was intended by the later reordering of sections in the FAR, *see* 46 Fed.Reg. 42,303 (Aug. 20, 1981), plaintiffs maintained that the EPA clauses' reference to "established prices" should be read with the predecessor regulation's reference to "contractor's established prices" in mind.

adjustments could be based only on changes in the individual contractor's prices and not on changes in overall market prices.

We rejected that argument in *Williams Alaska Petroleum, Inc. v. United States*, 57 Fed.Cl. 789, 797 (2003), holding that FAR § 16.203 "not only permits adjustments to a contractor's established prices to be based on market indexes, but in fact requires it." As noted above, this understanding was in turn upheld by the Federal Circuit in *Tesoro*, 405 F.3d at 1347, in which the court ruled that an EPA clause comports with FAR § 16.203–1 if it reflects "industry-based prices" which "may be established by reference to either a catalog or market sources independent of the manufacturer or vendor."

In their amended complaint, plaintiffs now object to the use of the PMM as the standard for making contract price adjustments on essentially three grounds. First, plaintiffs argue that the contracts were illegal because the EPA clauses were based on a measure other than plaintiffs' own established fuel prices, were not market-based, and did not reflect the fair market value of the fuel. Second, plaintiffs contend that the use of the EPA clauses violated DESC's duty to ensure that the agency pay fair market value for the fuel it received, giving rise to an assortment of common law claims such as misrepresentation and mistake. Third, plaintiffs maintain that DESC's possession of the fuel constitutes a Fifth Amendment taking. Finally, plaintiffs conclude by alleging assorted violations of law in connection with DESC's small business program.

In defendant's view, plaintiffs have asserted no cause of action that would entitle them to relief. As to the first point, defendant maintains that the standards plaintiffs identify—that EPA clauses must be based on a contractor's own established fuel prices, must be "designed or intended" to set prices, and must "reflect at least the fair market value of military fuel"—are nowhere found in the law. Indeed, defendant contends that the EPA clauses plaintiffs now challenge are the very ones upheld by the Federal Circuit in *Tesoro*. That ruling, defendant further argues, also disposes of plaintiffs' various other challenges to the EPA clauses because such clauses need only be based upon "industry-based prices" which "may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." *Id.* As to plaintiffs' Fifth Amendment takings claim, defendant maintains that where the rights in question are the subject of a contract, no takings claim can lie. Finally, defendant asserts that plaintiffs have forfeited any rights they possessed under the contracts by failing to file suit until 17 years after the award of the first contract containing the challenged EPA clause. We address these arguments below.

### The Legality of DESC's EPA Clauses

■ Plaintiffs' first argument—that a PMM-based EPA clause is defective because it does not reflect a contractor's established prices—is foreclosed by the Federal Circuit's decision in *Tesoro*, 405 F.3d at 1348. In *Tesoro*, the court considered FAR § 16.203–1—the provision at issue here—which recognizes two types of adjustments based on established prices: those based either on "published" prices or on "otherwise established prices." The Federal Circuit concluded that the term "established prices" should be read with reference to FAR § 15.804–3, which it observed "defines 'established prices' to include contractor-specific prices, namely 'established catalog prices,' and industry-based prices, namely 'established market prices.'" *Id.* at 1347.[6]

The court went on to reject the plaintiff's assertion—also made here—that adjustments must be based only on the prices of the

---

6. While FAR § 16.203–1 does not define the terms "published" or "otherwise established" prices, FAR § 16.203–4 refers to the use of established prices for items that have either established "catalog" or "market" prices, as those terms are defined in FAR § 15.804–3. FAR § 15.804–3 in turn defines "established catalog prices" as prices recorded in "a catalog, price list, schedule, or other verifiable and established record" that is "regularly maintained by the manufacturer or vendor" and "published or otherwise available for customer inspection," and defines "established market prices" as "current prices that (i) are established in the course of ordinary and usual trade between buyers and sellers free to bargain and (ii) can be substantiated by data from sources independent of the manufacturer or vendor."

individual contractor, noting that such a proposition "eviscerates the regulatory meaning of the term 'established prices' and the policy reasons for using it." *Id.* Based, then, on the interplay of the four sections of FAR § 16.203, the court observed that "a 'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." *Id.* Pursuant to that standard, the court concluded that the PMM-based EPA clause was indeed an "established prices" clause as envisioned by FAR § 16.203–1 and that "DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR." *Id.* at 1348. In light of the Federal Circuit's explicit endorsement of an EPA clause tied to the PMM, we would have no reason—indeed, no basis in law—to conclude, as plaintiffs would have us do, that an EPA clause must be based on a contractor's own prices. Accordingly, we are unwilling to invalidate the instant EPA clauses on that ground.

■ Plaintiffs argue in the alternative, however, that such clauses are nevertheless illegal because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel." In support of this position, plaintiffs rely on various DESC memoranda, as well as DESC testimony before Congress, for the proposition that DESC expressly represented that its use of adjustable prices was intended to ensure the sale of fuel at its market price. Plaintiffs additionally cite *Barrett Refining Corp. v. United States,* 242 F.3d 1055, 1060 (Fed.Cir.2001), in support of the view that DESC's pricing clauses embodied an enforceable promise to "pay at least fair market value" for fuel. Finally, plaintiffs offer the findings of their experts, Professor Joseph P. Kalt and Mr. Peter Killen, that the "PMM-based adjustment clauses failed to provide an effective measure of established market prices or the fair market value of military fuels" since the PMM varied "from the change in the marketplace from approximately—7 to approximately +13 cents" and the PMM and the marketplace "frequently ... move[d] in different directions in a starkly erratic fashion."

In defendant's view, the charge that the PMM fails to reflect fair market value has no relevance to the parties' actual price agreement since the FAR requires nothing more than that EPA clauses be market based. Nor, defendant contends, is it correct to assume, as Kalt and Killen's report does, that the "market" is represented only by the spot market price assessments published in Platts. To the extent that the PMM is based on the actual sales data reported by refiners of petroleum, defendant argues that it must surely be construed as being based upon market prices and must be seen as satisfying FAR § 15.804–3's requirement that market prices be established in the ordinary course of business "between buyers and sellers free to bargain." Defendant additionally notes that the *Tesoro* court determined the legality of the DESC clause with little more than the legal description of the PMM.

We agree with defendant that plaintiffs are attempting to import a standard nowhere found in the law. Like the *Tesoro* court, we read the requirement that adjustments be "based on increases or decreases from an agreed-upon level in ... established prices of specific items," FAR § 16.203–1, as being satisfied if the adjustments are based on "market sources independent of the manufacturer or vendor," *Tesoro,* 405 F.3d at 1347. The PMM, described by the Federal Circuit as a "market publication" compiling "the monthly average sales figures" reported by refiners, *id.* at 1341, certainly qualifies as such a source. As the DESC noted in a memorandum to its parent organization, the Defense Logistics Agency ("DLA"), the PMM references "don't just 'track' the market—they are the market."

We must similarly reject plaintiffs' characterization of *Barrett,* 242 F.3d 1055, as imposing a standard other than the one set forth in the parties' contracts. In *Barrett,* the Federal Circuit indeed expressed support for the trial court's factual finding that the government had promised to pay at least fair market value for the fuel it acquired. *Id.* at 1060. That observation, however, was predicated on the government's concession before the trial court that the EPA clause was

unauthorized, an assumption the appeals court was not asked to address. Thus, the Federal Circuit's conclusion that "[o]nce the unauthorized [EPA] clause is struck out, ... [the] express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value," *id.* at 1059 (quoting *Barrett Ref. Corp. v. United States,* 45 Fed.Cl. 166, 170 (1999)), did nothing more than seek a substitute for a presumptively defective pricing term. Because we hold that the instant PMM-based EPA clauses were in fact legal, we have no need for a similar exercise here.

█ Even if fair market value is not guaranteed by the contracts, however, plaintiffs contend that it is mandated by regulation. In their second amended complaint, plaintiffs assert a cause of action based on FAR § 15.802(b), which they read as requiring the contracting officer to ensure that prices are fair and reasonable. FAR § 15.802(b) provides in relevant part:

> Contracting officers shall—
>
> (1) Purchase supplies and services from responsible sources at fair and reasonable prices ....

That directive, in defendant's view, does not provide the contractor with an enforceable interest but merely provides internal government direction. *See, e.g., Am. Tel. & Tel. Co. v. United States,* 307 F.3d 1374 (Fed.Cir. 2002) ("*AT & T*") (holding that the language in an appropriations statute cautioning against the use of fixed-price contracts to fund developmental efforts absent a determination of realistic pricing created no judicially enforceable rights in the contractor); *Short Bros., PLC v. United States,* 65 Fed. Cl. 695, 764–65 (2005) (describing FAR § 15.802's directive that the contracting officer "[p]urchase supplies and services from responsible sources at fair and reasonable prices" as "do[ing] no more than [ ] provid[ing] internal government direction" that "does not afford a judicial remedy"). The regulation is not designed to protect contractors, in other words, but to protect the government from prices that are higher than warranted. *See, e.g., All Phase Envtl. Inc.,* B–292919.7, 2004 CPD ¶ 62, 2004 WL 437450, at *7 (Comp.Gen.Feb.4, 2004); John Cibinic,

Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 1279 (3d ed. 1998) ("The primary focus of these requirements is to ensure that the Government does not pay *unreasonably high* prices."). In addition, defendant contends that FAR § 15.802 is inapplicable because it applies only to the initial award prices and not to the prices DESC sets using the PMM.

While we reject defendant's latter argument as putting forth a distinction without a difference (we think it meaningless to differentiate between award and adjusted prices where DESC acknowledges that it never intended to pay the initial bid price), we cannot accept plaintiffs' initial assertion that FAR § 15.802(b) confers on them a right of action. To the extent that the Federal Circuit did not find an actionable wrong in the violation of a statute in *AT & T,* we are unwilling to find one based on a regulation in the instant case. *AT & T,* 307 F.3d at 1378–79 (characterizing section 8118 of the Department of Defense Act, Pub.L. No. 100–202, § 8118, 101 Stat. 1329, 1329–84 (1987), as providing only internal governmental direction and not giving rise to a remedy for private parties in a judicial forum). As the *AT & T* court stated, "[t]he fact that a procurement practice is prohibited does not necessarily mean that it is therefore actionable. The discipline to be administered in such cases is a responsibility of the cognizant procurement officials within the agency ... [and not] by this court." *Id.* at 1380 (quoting *E. Walters & Co. v. United States,* 217 Ct.Cl. 254, 576 F.2d 362, 367 (1978)).

Ultimately, we believe that plaintiffs' challenge is to the type of market-based clause selected by the contracting officer—a decision committed to the agency's discretion. *Durable Metals Prods., Inc. v. United States,* 27 Fed.Cl. 472, 478 n. 6, *aff'd,* 11 F.3d 1071 (Fed.Cir.1993) (observing the "prevailing view among courts" that "determinations in procurement matters should ordinarily be left to the discretion of administrative officials exercising procurement authority"); *accord* 10 U.S.C. § 2306(a) (2000) (providing that an agency head "may enter into any kind of contract that he considers will promote the best interests of the United

States"). We can thus find no fault with DESC's selection of a market-based index such as the PMM on which to base contract price adjustments.

*Plaintiffs' Alternative Claims*

If *Tesoro* effectively disposes of plaintiffs' illegality arguments, plaintiffs nevertheless contend that their remaining claims retain their vitality. In plaintiffs' view, the fact that DESC knowingly employed a system that was not designed to produce—and allegedly did not produce—fair and reasonable prices for jet fuel constitutes a breach of the parties' contract, a unilateral or mutual mistake, failure of consideration and frustration of purpose, misrepresentation, and a Fifth Amendment taking. We do not, however, find any of plaintiffs' theories to have merit. Each of these claims is predicated on the assumption that DESC's use of PMM-based EPA clauses was somehow defective, a conclusion, as discussed above, we are unwilling to draw. Plaintiffs have offered no evidence that the PMM, Platts, or OPIS were anything other than what they purported to be: publications of certain market pricing data and, in the case of the PMM, the reporting of actual sales data required by statute.

Because we conclude that DESC had no affirmative obligation to ensure the payment of fair market value above and beyond the payment of market value (as established by market prices), plaintiffs' counts of illegality, breach of contract, failure of consideration and frustration of purpose, and implied-in-fact contract must be dismissed under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. We are unable to find, for instance, any breach of contract based on a failure to pay fair market value when the government both clearly stated and complied with the contracts' actual pricing terms. *Hercules Inc. v. United States,* 292 F.3d 1378, 1380–81 (Fed.Cir.2002) (noting that "[i]n contract interpretation, the plain and unambiguous meaning of a written agreement controls."). Similarly, we have no need to resort to an implied-in-fact contract

theory when we find no illegality in the price adjustment clause contained in the express contracts. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997) (observing that "an implied-in-fact contract cannot exist if an express contract already covers the same subject matter").

Plaintiffs' claims of misrepresentation and unilateral or mutual mistake are likewise unavailing. These claims amount to an assertion either that the PMM did not reflect fair market value and that DESC deliberately withheld that fact from the contractors who relied on it to their detriment, or in the alternative, that one or both parties were mistaken as to the true nature of the PMM. Even reading the evidence on which plaintiffs rely in their favor, however, we cannot reach the conclusion plaintiffs urge.[7]

In support of their misrepresentation claim, plaintiffs quote from a 1993 DESC memorandum which observed that the agency utilized adjustable prices in an effort to "ensure[ ] that the sale will be at the market price, which is a fair and reasonable price. Not only is the Government protected, but the contractor is protected by knowing that its price will always be related to the price it could obtain in the commercial marketplace." Plaintiffs additionally note that DESC made similar misrepresentations to the DLA (asserting that the PMM was "virtually unimpeachable"); to suppliers (contending both that the PMM "consistently reflects actual market prices" and that it is "a reliable indicator of price movements in the petroleum products market"); and to this court (testifying that the PMM is "the benchmark against which we ... compare everything domestically"). Plaintiffs point out, however, that when DESC was directed by the DLA in 1994 to refrain from using the PMM to set prices, it made the "extraordinary admission" that the prices it had set based on the PMM so departed from market value that they

---

**7.** *Although defendant originally moved under RCFC 12(b)(6) to dismiss plaintiffs' mistake and misrepresentation claims, it acknowledged that its motion would be converted to a RCFC 56 motion if the court were to rely on documents* outside the pleadings to dispose of any count. We thus convert defendant's challenges to plaintiffs' claims of misrepresentation and unilateral or mutual mistake to a summary judgment motion pursuant to RCFC 56.

could not be compared to prices set based on Platts or OPIS.[8]

Noticeably absent from this list of internal documents, however (many of which were issued long after the formation of the contracts at issue here), is any allegation that the contracting officer actually made representations about the PMM directly to plaintiffs. Nor do any of the sources plaintiffs cite prove the point that DESC knew of the PMM's alleged failure to reflect fair market value or that it knowingly withheld that information from plaintiffs. What plaintiffs see as inconsistencies regarding DESC's assessment of the PMM-based EPA clauses merely reflect open debate about the relative merits of various pricing mechanisms.[9] Such internal discussions can confer no right upon plaintiffs where there has been no showing— nor indeed even an allegation—that the PMM-based EPA clauses to which the parties agreed were incorrectly applied. Indeed, there is no indication that DESC, in its internal consideration of the PMM, ever regarded it as anything other than an accurate and reliable source of market price data.

If DESC did not in fact misrepresent the facts, plaintiffs allege that the parties were at a minimum mistaken in their belief that the PMM was designed to reflect, or did in fact reflect, fair market value. In this regard, plaintiffs note that "the PMM is not intended to be an index that is used for setting prices." *Barrett Ref. Corp. v. United States,* 42 Fed.Cl. 128, 131 (1998); *see also Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1184, 1186 (Fed.Cir.1988) (characterizing an index that did not "fair[ly] ... measure ... the economic situation actually confronting the contractor" as an "inappropriate and inadequate ... price index" whose inclusion in the contract's escalation clause "constituted mutual mistake of material fact"). No showing has been made, however, that either party was under a misapprehension regarding the PMM as to either the source data it reported or the manner and means by which that data would be applied as the reference guide in the adjustment of the contract prices. *See* Restatement (Second) of Contracts § 151 (1981) (defining a mistake as "a belief that is not in accord with the facts"). In short, there was no mistake here.

As to the contention that the PMM was not compiled for use as a pricing index, the point, while correct, is irrelevant. Though not specifically designed to set fuel prices, the PMM nevertheless served that purpose well because, as explained by DESC's former acting director of the Office of Market Research and Competition, the PMM was "an ideal kind of index for our purposes ... because ... our prices would be actually indexed to the actual sales levels themselves and would be moving up and down ... with those actual sales levels."[10] Accordingly, plaintiffs' counts of misrepresentation and unilateral or mutual mistake must be dismissed pursuant to RCFC 56.

■ Finally, we are aware of no authority that would identify as a Fifth Amendment

---

8. In an internal "Price Analysis Memorandum" prepared in connection with a procurement to compare current and proposed prices, DESC stated: "Direct contract price comparisons are not possible due to the switch from the monthly, interim-final (PMM) escalation method to a weekly market price escalation basis [using Platts and OPIS]." Defendant explains this language, however, by noting that any price comparison is inapt because Platts is a weekly report tracking spot prices and the PMM is a monthly report tracking all sales.

9. In a 1987 "decision paper" outlining the various options for adjusting long-term contract prices in domestic bulk fuel contracts, for instance, DESC's Office of Market Research and Analysis concluded as follows:

The current PMM-based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk.

Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals [e.g., Platts or OPIS]. By the criteria of product, geography, and commonality, there is no clear preference between the alternate systems. By contrast, when DESC sought a FAR deviation in 1994 to authorize the one-time use of a price-adjustment clause based on Platts, it noted that the use of Platts rather than a PMM-based reference would eliminate the need for two price adjustments and that a commercial publication such as Platts was widely accepted by the industry and would be simpler to use.

10. The quoted testimony comes from a July 27, 1998, deposition of Mr. Lawrence Calvin Ervin in connection with the trial proceedings in *Barrett,* 45 Fed.Cl. 166. Mr. Ervin's testimony was made a part of the record in this case.

taking the acquisition of property by the government pursuant to a valid contract with a willing seller. *La Van v. United States*, 382 F.3d 1340, 1352 (Fed.Cir.2004) (holding that a contract constitutes a right to the payment of damages in the event of nonperformance and that no taking can occur as long as such a right exists). As this court and its predecessor court have held, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Castle v. United States*, 48 Fed.Cl. 187, 217 (2000), *rev'd in part on other grounds by* 301 F.3d 1328 (2002), (quoting *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978)). Such is the case because a litigant to whom a contract remedy is available—as is the case here—has not been deprived of the rights conferred on him by contract. Plaintiffs' takings claim therefore must fail.

*DESC's Small Business and Minority Set–Aside Programs*

In addition to their challenges to the PMM-based EPA clauses, plaintiffs complain that the market price for fuel was further distorted by DESC's auction of fuel contracts to small businesses that agreed to meet the price of other bidders and by its ten-percent price preference to minority-owned suppliers.[11] Both set-aside programs, in plaintiffs' view, placed downward pressure on bid prices as non-minority and non-small businesses were forced to compete on an uneven playing field. Plaintiffs argue that those policies were thus in violation of the Office of

Federal Procurement Policy Act ("OFPPA"), 41 U.S.C. § 423 (1989) (prohibiting the holding of an auction by asking small businesses to match other bidders' prices and awarding contracts based thereon); the Department of Defense Federal Acquisition Regulation Supplement ("DFARS"), 48 C.F.R. § 252.219–7001 (1995) (establishing a prohibition on improperly soliciting and awarding portions of the procurements set aside for small businesses together with those for large businesses); and in the case of the minority set-aside program, the equal protection component of the Fifth Amendment's due process clause.

Under its small business set-aside program, DESC instructed both large and small businesses to submit offers which it in turn evaluated as if there were no set-aside quantities. Before it awarded the basic quantities to any offeror, however, DESC would offer the set-aside quantities to qualifying small businesses at the price offered by the otherwise successful bidder. If no small business offeror accepted the set-aside quantities at the offered price (a scenario referred to as a "set-aside failure"), DESC added the set-aside quantities back to the basic quantities and awarded both to the low offeror. That process contrasts with the procedures set forth in the FAR and the DFARS, which anticipate the offering of set asides *after* the basic quantities are awarded and, in the event of a set-aside failure, provide for the set-aside portion to be resolicited. FAR § 19.502–3(c); DFARS § 252.219–7001(c).[12]

Plaintiffs' argument focuses on this deviation from the FAR. In plaintiffs' view, DESC's practice of awarding contracts to small businesses willing to match the lowest

**11.** According to plaintiffs, DESC set aside for award to small businesses more than forty percent of the fuel it procured and awarded fuel contracts to minority-owned suppliers if their bids were within ten percent of the bid prices of otherwise successful bidders.

**12.** In a deposition submitted in a related fuel case, the contracting officer explained that the reason DESC awards set-aside failure quantities under the original acquisition rather than re-soliciting is "due to the complexity and size of the annual bulk acquisition of fuels." The contracting officer went on to note:

This procedure enables DESC to acquire the entire requirement for bulk fuels without re-soliciting, thereby reducing procurement lead-time and saving considerable effort. The delay that would result from re-solicitation could adversely affect the mission and readiness posture of military units dependent upon those requirements.... DESC has, for decades, had deviations authorizing the use of its clauses and procedures.

Declaration of John Walker, filed in *Gary–Williams Energy Co. v. United States*, Fed.Cl. No. 03–2106C.

bid price, or adjusted bid price, of a large business violates the OFPPA's express prohibition on the disclosure of "contractor bid or proposal information or source selection information *before* the award of a Federal agency procurement contract." 41 U.S.C. § 423(a)(1) (emphasis added). Plaintiffs argue that awarding "match price" contracts to small businesses only *after* contracts have first been awarded to large businesses is key to compliance with the OFPPA. This is the case, plaintiffs explain, because the award of a contract to a large business ends that business's participation in the procurement, leaving it unaffected by any subsequent disclosure of its bid prices to small business competitors. Such a procedure additionally prevents large businesses from having to lower their bid prices to discourage small businesses from accepting the "match price," thereby preserving the set-aside quantities for award to large businesses.

We do not believe that plaintiffs' challenges to DESC's small business set-aside program are well founded. As defendant points out, DESC's set-aside program did not constitute a prohibited auction because it did not involve the "direct bidding of price between two competing offerors" as is prohibited by the OFPPA. *DGS Contract Serv., Inc. v. United States,* 43 Fed.Cl. 227, 239 (1999). Under the DESC program, a small business offeror is given the opportunity to match the price the government would otherwise pay. If the small business agrees, it is awarded the set-aside portion; if it declines, the set-aside portion is awarded to a large business under the original acquisition. Thus, no back-and-forth occurs between one offeror and another. In addition, there exists no strict prohibition on the disclosure of bid prices. *MTB Group, Inc.,* B–295463, 2005 CPD ¶ 40, 2005 WL 433615, at *2 (Comp. Gen. Feb.23, 2005) (observing that neither the OFPPA nor the FAR contain an "absolute prohibition against disclosure of price information, and both make clear that prices can be disclosed under certain circumstances"); *see also Defense Fuel Supply Center's Small Business Set–Aside Procurements,* B–230556, 1988 WL 227932, at *4 (Comp.Gen. Sept.6, 1988) (finding that DESC's small business procedures are con-

sistent with applicable law and regulation). Finally, plaintiffs' claim that DESC's set-aside program forces large businesses to lower their bid prices to discourage small businesses from matching those prices merely reflects an essential component of the competitive process and is not therefore an objectionable injury.

■■■ More importantly, however, we believe that any objection plaintiffs may have had to DESC's small business or minority set-aside programs should have been raised prior to the award of the contracts, when DESC had an opportunity to remedy any alleged defects. While a contract procurement that harbors an equal protection violation is indeed actionable in this court, *see Rothe Dev. Corp. v. United States,* 262 F.3d 1306 (Fed.Cir.2001), the remedy lies with the court's injunctive authority and not in a money judgment for damages or restitution. Simply put, plaintiffs cannot on the one hand remain silent in the face of what they now contend was a facially invalid solicitation and admittedly reduce their prices to remain competitive (a strategy the record demonstrates proved continuously successful), and then, on the other hand, seek many years after the fact to challenge the prices they themselves had set. Plaintiffs are thus estopped from asserting this claim and defendant is entitled to judgment as a matter of law.

*Waiver*

■■■ Indeed, the same rationale for dismissing plaintiffs' small business and minority set-aside counts would apply equally to the entirety of plaintiffs' claims. Plaintiffs did not challenge the legality of using the PMM for economic price adjustments until 2002— more than 17 years after the first contract was awarded and nine years after the *MAP-CO* decision was issued. That delay, we believe, is sufficient to constitute an "intentional relinquishment or abandonment of a known right or privilege" as discussed in *Hermes,* 58 Fed.Cl. at 411 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). *See also Whittaker Elec. Sys. v. Dalton,* 124 F.3d 1443 (Fed.Cir.1997);

*E. Walters & Co.,* 217 Ct.Cl. 254, 576 F.2d 362.

In *Hermes,* the court considered whether a waiver defense was available in this circuit against claims of illegality by the government involving the FAR. Observing that "the Federal Circuit seems to be of two minds on this issue," the court reconciled apparently competing lines of cases by identifying a "key factual distinction" between them: the defense of waiver was not sustained where "the contractors either complained during contract formation or, at the very least, at an early stage in the history of the conflict." *Id.* at 412–13 (quoting *Hermes Consol., Inc. v. United States,* 58 Fed.Cl. 3, 19 (2003)).[13] The court went on to conclude that the plaintiff had in fact waived its claims by waiting 14 years after entering the first contract at issue and eight years after entering the last contract before bringing suit. *Id.* at 413. In particular, the court observed:

> [The plaintiff], "who was and is a sophisticated government contractor," astonishingly waited fourteen years after entering the first PMM-based contract before suing in this court, and waited eight years after entering the last PMM-based contract before litigating. [The plaintiff] never complained that it was not making a profit. And [it] never complained that the contract it was fulfilling was in part unlawful. [The plaintiff] commenced this action, the court must add, a full ten years after the *MAP-CO* decision was rendered. Clearly, it knew or should have known that the EPA clause was suspect. Again, this conduct is far more egregious than that which occurred in either *Beta Systems, Inc.* or *Chris Berg[, Inc.].*

*Id.* (quoting *Hermes,* 58 Fed.Cl. at 19). The court further explained:

> [W]herever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse .... As a general proposition, one side cannot continue after a material breach by the other ..., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.

*Id.* at 418 (citations omitted).

Similarly, in *AT & T,* 307 F.3d at 1380, the court observed that the contractor "was fifteenth among the Top 100 Federal Contractors, having 1,438 procurement actions worth over $2 billion," but nevertheless had failed to seek a cost reimbursement contract during contract negotiations. Based on those findings, the court concluded that the contractor had waived its claim: "In short, the proper time for AT & T to have raised the issues that it now presents was at the time of contract negotiation, when effective remedy was available." *Id.* at 1381. The court accordingly opined that it was "not inclined to change the rules and the scoring after the game has been played." *Id.*

The courts' conclusions in *Hermes* and *AT & T* apply equally to the instant case. Plaintiffs are sophisticated contractors with lengthy experience performing DESC contracts, including the successful completion of the 41 contracts now at issue, delivering some 1.5 billion gallons of fuel and in return receiving approximately $976 million for their successful contract performance. Despite that expertise, plaintiffs raised no objection to the PMM-based EPA clauses for more than 17 years, well after the challenged clauses were first employed. Any knowledge or cause of action plaintiffs possessed on the date they filed suit in 2002, they similarly

---

**13.** On at least three occasions, the Federal Circuit has held that the doctrine of waiver precludes a contractor from challenging the validity of a contract under an unlawful regulation or other legality where the contractor fails to raise the problem prior to execution or litigation. *See, e.g., AT & T,* 307 F.3d 1374; *Whittaker,* 124 F.3d 1443; *E. Walters & Co.,* 217 Ct.Cl. 254, 576 F.2d 362. In *MAPCO,* 27 Fed.Cl. 405, however, the court relied on *Beta Systems* and *Chris Berg, Inc. v. United States* to conclude that a contractor will not be bound by estoppel or waiver where a government-drafted contract clause is in violation of law. *Beta Sys.,* 838 F.2d at 1185–86 (holding that where the use of an EPA clause was in violation of the DAR, "the government can not, by law, benefit from it" and thus declining to apply the doctrine of waiver); *Chris Berg, Inc. v. United States,* 192 Ct.Cl. 176, 426 F.2d 314, 317 (1970) (ruling that "[i]f officials of the Government make a contract they are not authorized to make, the other party is not bound by estoppel or acquiescence or even failing to protest.").

possessed after the performance of the initial contract. As in *Hermes*, 58 Fed.Cl. at 416, "intelligent waiver" can be presumed based on the instant plaintiffs' general sophistication and lengthy failure to object.

Plaintiffs attempt to distinguish *Hermes* on the ground that that decision presumed the contractor's knowledge of DESC's violation of law whereas they contend that they themselves lacked knowledge of the material facts (*i.e.*, that the PMM did not reflect fair market value). *Id.* (identifying the contractor's presumed knowledge of a regulation as the key factor in establishing the waiver of a regulatory benefit). Plaintiffs maintain that they filed suit following the 2001 decision in *Barrett*, 242 F.3d 1055, in which the Federal Circuit upheld the trial court's determination that a contractor was entitled to the fair market value of jet fuel under an implied-in-fact contract when the EPA clause at issue was found to be illegal. Only then, plaintiffs allege, were they alerted that remedies were available to permit payment of fair market value in accordance with their expectations.[14]

In support of their position, plaintiffs offer the declarations of Mr. J. Mark Wagner and Mr. Mike McGowen (employees involved with the negotiation of plaintiffs' fuel contracts) asserting that plaintiffs entered into the contracts believing that DESC's prices were legal and would reflect fair market value. Further, plaintiffs maintain that they had only 11 annual observations (from 1983 to 1994, the reference year for the last DESC contracts that used PMM-based escalators) from which to draw inferences about the PMM—an insufficient number to reveal the true bias in the PMM. As a result, plaintiffs argue that they cannot be presumed to have intended to relinquish their right to the payment of fair market value.

Plaintiffs' objection, however, proves too much. If, as the Kalt and Killen report claims, it was impossible to discern the direction of the PMM's bias, contractors should have been able to identify that problem as the contracts progressed. Plaintiffs cannot plausibly claim that they entered the contracts expecting to receive fair market value for their fuel shipments but did not become aware that this was not the case until the decision in *Barrett* was issued declaring the PMM an invalid index. Indeed, the only information plaintiffs now have available to them that they did not possess at the time of contract performance were subsequent decisions by this court. As the court noted in *Hermes*, however, such decisions "did not create new law, [they] merely construed existing regulations." 58 Fed.Cl. at 417. We believe that the fact that plaintiffs never complained that the EPA clauses were ambiguous or functioned in a manner other than that suggested by their plain language is fatal to their case.[15]

---

14. Phillips submitted separate certified Contract Disputes Act claims between April 2, 2001, and October 12, 2001, alleging that it was entitled to an additional $50 million on 17 contracts because the EPA clauses in those contracts were illegal under *MAPCO*, and Conoco similarly submitted separate certified Contract Disputes Act claims on July 26, 2002, seeking $93 million on 24 contracts. Neither contractor, however, asserted that the EPA clauses were ambiguous, that they failed to operate as expected, or that they did not protect the contractor from significant fluctuations in costs or prices. In final decisions dated October 15, 2001, and December 9, 2002, respectively, the contracting officer denied Phillips' and Conoco's claims, concluding, *inter alia*, that the EPA clauses were authorized and enforceable and that the contractors' calculations of their damages, based on Platts, did not reflect fair market value.

15. We are additionally persuaded by defendant's argument that since plaintiffs possessed superior knowledge of their own costs and market operations, they were in the best position to assess the efficacy of the EPA clauses as applied to them and should thus be estopped from now challenging those clauses. In defendant's view, the fact that plaintiffs incorporated the PMM-based EPA clauses into their bids without objection prejudiced the government by preventing it from timely seeking a deviation. Plaintiffs thus foreclosed the "relatively painless alternative," *E. Walters & Co.*, 576 F.2d at 367, of seeking a deviation in favor of what defendant describes as "the after-the-fact, competition-free, speculative recovery" plaintiffs now seek. See *Ling–Temco–Vought v. United States*, 201 Ct.Cl. 135, 475 F.2d 630, 638 (1973) (observing that a contractor had "in effect retained all options for itself ... made its calculations entirely in its own favor, without proper consideration of the defendant's position," and had violated the "basic principle calling for fair treatment of both parties"). Indeed, as the record demonstrates, the government actually sought and received such a deviation authorizing its continued use of PMM-based EPA clauses in response to the decision in *MAPCO*.

*Plaintiffs' RCFC 56(f) Motion*

As a final matter, we see no legitimate basis for granting plaintiffs' RCFC 56(f) motion seeking additional discovery. Of the two counts of the complaint that we decide on summary judgment (misrepresentation and mistake), our disposition in each instance rests on facts that plaintiffs have included in their appendix in support of their allegations. Even when read in a light most favorable to plaintiffs, however, these facts fall far short of demonstrating either "that DESC knew that the PMM did not reflect the marketplace, misrepresented that fact to its suppliers, and, nonetheless, used the PMM to set prices for its own benefit" or that "the parties were mistaken in their ... belief about what the PMM was, how it was designed, and for what it was intended to be used."

Nor is it correct to say, as plaintiffs do, that additional discovery would remedy the deficiency in their proof. Plaintiffs' RCFC 56(f) motion and accompanying affidavit assert the need for additional discovery, but do not explain why such discovery is required in light of defendant's legal arguments. Plaintiffs' bald allegations are thus insufficient to warrant the broad discovery they seek. *See, e.g., Paalan v. United States,* 57 Fed.Cl. 15, 18 (2003) (denying discovery where the plaintiff's affidavit failed to set forth "explicit reasons why discovery is needed to oppose defendant's motion for summary judgment" or why the facts sought to be discovered "are relevant and necessary to the preparation of his opposition to defendant's motion for summary judgement"). Accordingly, plaintiffs' RCFC 56(f) motion is denied.

## CONCLUSION

For the reasons set forth above, we rule in defendant's favor and direct the Clerk to dismiss Count I (Illegality), Count III (Breach of Contract), Count IV (Implied–In–Fact Contract), Count V (Failure of Consideration and Frustration of Purpose), and Count VII (Fifth Amendment Taking) of plaintiffs' second amended complaint pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted, and Count II (Misrepresentation) and Count VI (Mistake) pursuant to RCFC 56. Plaintiffs' RCFC 56(f) motion for additional discovery is denied.